ROBERT J. GLADWIN, Judge
Appellant Stephanie Meisch appeals the September 21, 2018 order by the Faulkner County Circuit Court terminating her parental rights to her two-year-old daughter, J.S.[1] Pursuant to Linker-Flores v. Arkansas Department of Human Services , 359 Ark. 131, 194 S.W.3d 739 (2004), and Arkansas Supreme Court Rule 6-9(i) (2018), Meisch's counsel has filed a motion to withdraw and a no-merit brief asserting that there are no issues of arguable merit to support an appeal. The clerk of our court sent copies of the brief and the motion to withdraw to Meisch's address of record informing her of her right to file pro se points for reversal pursuant to Rule 6-9(i)(3). The packet was returned undeliverable, marked "return to sender."[2] No additional contact information has been provided for Meisch to either the clerk's *447 office or to the Public Defender Commission. Meisch has not filed any pro se points for reversal. We affirm the termination of parental rights and grant counsel's motion to withdraw.
I. Facts and Procedural History
The case began on June 12, 2017, when a caller reported to the Arkansas Child Abuse Hotline that Meisch was on methamphetamine "really bad," that she was blowing smoke into J.S.'s face, that J.S. had "horrible" diaper rash, and that Meisch would stay up for days and then pass out for a week. An investigation resulted in appellee Arkansas Department of Human Services (DHS) exercising an emergency removal of J.S. An affidavit attached to the emergency petition filed on June 15 noted that Meisch smelled of marijuana and was acting erratically while holding then six-month-old J.S. The following day, the court signed an emergency order giving custody of J.S. to DHS based on Meisch's drug use as alleged in the affidavit. The circuit court's emergency order noted that the family had a history with the state of Arizona, where Meisch previously had her parental rights terminated to four other children.
On June 27, the circuit court held a combined probable-cause and adjudication hearing and found that J.S. was dependent-neglected because Meisch was "visibl[y]" under the influence of drugs and/or alcohol while caring for J.S. The court also made a factual finding that Meisch had given birth to several other children and had lost custody of those children through legal proceedings in Arizona. The court ordered Meisch to cooperate and stay in contact with DHS; keep DHS informed of any and all status changes; participate in individual and family counseling as recommended by a therapist; refrain from illegal drugs and alcohol; submit to a drug-and-alcohol assessment; attend Alcoholics Anonymous/ Narcotics Anonymous (AA/NA) meetings at least three times a week and provide written documentation of attendance to DHS; complete parenting classes and demonstrate appropriate parenting skills; obtain and maintain stable housing and employment; maintain a clean and safe home for herself and for J.S.; and demonstrate an ability to protect J.S.
In October 2017, the circuit court noted in a review-hearing order that Meisch had (1) failed to appear at the hearing, (2) failed to comply with the case plan and court orders, (3) stopped attending visitation with J.S., and (4) made no progress toward alleviating or mitigating the causes of J.S.'s removal. The court further noted that DHS had provided information that Meisch had moved to Arizona.
At the January 2018 review hearing, the circuit court noted that Meisch's lack of compliance had not changed. She again failed to appear at the hearing, and she had neither had meaningful contact with DHS nor made any progress toward alleviating or mitigating the causes of J.S.'s removal. Similar findings were made at the April 10 review hearing, except that Meisch made a request-though not appearing-for her mother to be considered for placement in Arizona. The court noted that Meisch had relocated to Arizona.
On June 5, 2018, the court held a permanency-planning hearing and found in a subsequent order dated August 3 that the goal of the case would be adoption because J.S. was not being cared for by a relative and that it was not in her best interest to be placed with Meisch's mother. The court found that Meisch had not complied with the case plan or court orders in that she (1) had not had any contact with DHS or *448 J.S. in five months;[3] (2) was living in Arizona and had not completed the services outlined in the case plan and court orders, including drug rehabilitation, counseling, parenting, and visitation with her child; and (3) she had made no progress toward alleviating or mitigating the causes of J.S.'s removal from the home. The court set the case for a termination-of-parental-rights (TPR) hearing, and its findings were not appealed.
On June 20, 2018, DHS filed a TPR petition alleging that Meisch was unfit to parent J.S. for the following reasons:
a. That [J.S.] has been adjudicated by the [c]ourt to be dependent-neglected on June 27, 2017 and has continued out of the custody of [Meisch] for twelve (12) months and, despite a meaningful effort by [DHS] to rehabilitate the parent and correct the conditions which caused removal, those conditions have not been remedied by [Meisch]. Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) [Supp. 2017) ].
b. That [J.S.] has been adjudicated by the [c]ourt to be dependent-neglected on June 27, 2017, and has continued out of the home of the noncustodial parent, Frank Sutter, for twelve (12) months and, despite a meaningful effort by [DHS] to rehabilitate the parent and correct the conditions that prevented the child from safely being placed in the parent's home, the conditions have not been remedied by Frank Sutter. Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(b) .
c. [J.S.] has lived outside the home of [Meisch] and Frank Sutter for a period of twelve (12) months and both parents have willfully failed to provide significant material support in accordance with the parent's means or to maintain meaningful contact with the juvenile. Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(a) .
d. The parents, [Meisch] and Frank Sutter, have abandoned the juvenile. Ark. Code Ann. § 9-27-341(b)(3)(B)(iv).
DHS further alleged that it was in the best interest of J.S. for Meisch's rights to be terminated because Meisch had (1) not completed services aimed at remedying her substance-abuse issues, (2) not demonstrated that she could meet J.S.'s health and safety needs, and (3) abandoned J.S., and because J.S. could find permanency through adoption.
On September 4, 2018, a TPR hearing was held. Meisch testified that she had lived in Arizona since the end of February 2018-for seven months prior to the TPR hearing. She explained that she had married her current husband two months before the hearing but that she did not live with him because he was on parole and was not permitted to live with her. Although he is a felon, Meisch married him shortly before the TPR hearing, and her stated reason was that "he loves me, and I love him." Before she left for Arizona, she had not seen J.S. in six months; by the time of the TPR hearing, she had not seen J.S. in over a year.
When asked why she had moved, Meisch said she had to go away to "get right" because of her drug addiction. She acknowledged that the Arkansas Department of Children and Family Services (DCFS) provided her with a drug-and-alcohol assessment that she completed, but she acknowledged that she did not follow the recommendations or complete treatment. Meisch testified that she had no support system in Arkansas and that she moved back to Arizona where her family *449 lives. She acknowledged that she has four other children who were adopted by two separate siblings of hers when she went to prison in Arizona on a drug-related conviction. Meisch admitted that she did not stay in contact with DCFS caseworkers after moving to Arizona but stated that she did send J.S. a package that was received. Meisch testified that her mother stayed in contact with DCFS and attended at least one hearing remotely from Arizona that Meisch did not attend. Meisch explained that she did not attend many of the hearings during the case because she either could not afford the trip, or her work schedule did not permit the time off.
Regarding her drug use, Meisch said that she had been sober since the day her mother picked her up from Arkansas and took her to Arizona-approximately six months. She acknowledged that she tested positive on a hair-follicle test for meth and marijuana and that J.S. tested positive for marijuana, meth, and opiates. She stated that she believed she would pass a hair-follicle test and be negative for all illegal substances on the day of the TPR hearing, and she explained that she tried to get random drug screens in Arizona but that she could not get Arkansas DCFS to cooperate with Arizona DCFS.
Meisch said she needed time to prove that she was not a "bad mom," that it "took [her] a minute to get things right," and that she is "working on it." Meisch noted that after arriving in Arizona, she sought intensive help for herself and underwent a lengthy intake with Southwest Behavioral & Health Services that included completing both substance-abuse-relapse and parenting classes. She attended weekly drug meetings, counseling, and NA meetings. However, Meisch could not recall the NA steps and conceded that she never obtained a sponsor. Meisch testified that she underwent drug screens for her employment in the casino industry in Arizona, but she could not produce the results of those tests because her employer paid for them. She did produce a chain-of-custody form showing that she had undergone a drug screen. She said she was using drugs daily before she left Arkansas but that she had been sober since leaving on February 23.
As for her employment and living situation, Meisch explained that she had worked several jobs, quitting each to take a better job. By the end of July 2018, she had saved enough money to rent her own apartment. She clarified, however, that because of her history, she could not obtain the lease in her name, so her grandmother signed the lease for her. Meisch stated that she also took care of her criminal fines by paying off nearly $ 7,000 that had accumulated over seventeen years related to various charges, such as driving on a suspended license and possessing drug paraphernalia.
Meisch testified that while she had not seen J.S. in a year, it was never her intent to abandon her, saying that she needed to get well. She said that she tried to call the caseworker in Arkansas but could not get a return call, and she then tried to have the case transferred. Meisch explained why she made the decisions that she had and that her intent was to get clean and stay clean, which she had done. She asked that she at least be allowed to stay in contact with the foster parents-who expressed a desire to adopt J.S.-so that she could know that her daughter is okay.
Cheryl Taylor, the DCFS caseworker assigned to Meisch's case, testified that she previously had contact with Meisch in August 2017, over a year before the TPR hearing. She explained that Meisch had sent her a letter in March 2018 asking that her mother be considered for an Interstate Compact on the Placement of Children *450 (ICPC) placement in Arizona. Taylor said the ICPC paperwork was not completed until April 2018 even though Meisch's mom had contacted her at the beginning of the case.
Taylor confirmed that Meisch had not seen J.S. since August 2017 but that she had sent cards and stuffed animals for J.S. Taylor testified that Meisch had completed a drug assessment in September 2017 that resulted in a drug-treatment recommendation. Taylor said that Meisch did not comply with DHS's recommendation and also failed to complete other services in Arkansas, such as parenting classes and counseling. Taylor did not recall receiving any voicemails or messages from Meisch after she left for Arizona, although she did recall talking to Meisch's mother about the ICPC and that it appeared the family's plan for getting J.S. out of foster care was to rely on the ICPC study.
Laura Rogers, the DCFS supervisor, testified and acknowledged that the DCFS counterpart in Arizona could have been asked to assess Meisch's home there, and that in other cases, they had been fairly successful in getting the other state to perform an assessment. She also acknowledged that she could have done the same with random drug screens, although she noted that in the past, DHS had been less successful when working with other states on that issue.
Meisch argued that her uncontroverted testimony should be taken at face value. She stated that it demonstrated that none of the grounds had been proved and that she should be given additional time to demonstrate that her home is appropriate for J.S.'s return. Meisch asserted that she had been sober for a sufficient amount of time to alleviate any health and safety concerns for J.S. should she be placed in Meisch's custody.
The circuit court found that Meisch's "self-serving" testimony was not credible. The court noted that while Meisch testified that she was unable to get in touch with DHS for a year, Meisch's mother was able to stay in touch with the caseworker in an effort to obtain an ICPC home study. The court further noted that Meisch had taken no initiative to see her daughter in a year, that she relied on her mother to tend to the issues with DHS and J.S.'s placement in foster care, and that even if she elected to move away to escape the drug lifestyle, she also chose to have no meaningful contact with J.S. The court noted finally that the ICPC home study was deemed by the court to not demonstrate a suitable placement for J.S.-that finding was not appealed-and that there would be potential harm in sending J.S. to "unknowns" in Arizona. The court memorialized its findings in a written TPR order filed on September 21, 2018, and Meisch filed a notice of appeal on October 12, 2018.
II. Standard of Review
We recently reiterated our standard of review in Riggs v. Arkansas Department of Human Services , 2019 Ark. App. 185, at 5-6, 575 S.W.3d 129, 132 :
We review termination-of-parental-rights (TPR) cases de novo. At least one statutory ground must exist, in addition to a finding that it is in the children's best interest to terminate parental rights. A best-interest finding under the Arkansas Juvenile Code must include consideration of two factors, the likelihood of adoption and potential harm. However, adoptability is not an essential element of proof. The statute does not require any "magic words" or a specific quantum of evidence regarding a child's adoptability but simply provides that the circuit court consider the likelihood that the child will be adopted in making its best-interest determination. Potential *451 harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers from the lack of stability of a permanent home.
(Citations omitted.)
III. Analysis
In accordance with Arkansas Supreme Court Rule 6-9(i)(1)(A), counsel for Meisch has reviewed the record for all adverse rulings made by the circuit court on all objections, motions, and requests made by her at the hearing from which the appeal arose. Other than the TPR order itself, there were two objections made in which the court ruled adversely to Meisch.
A. Termination of Parental Rights
The primary issue before the court is whether there was sufficient evidence to support the circuit court's TPR order. Based on a conscientious review of the record, counsel has determined that there is no meritorious basis on which to argue that the evidence was insufficient, either as to the grounds alleged in support of TPR or as to the circuit court's finding that TPR was in J.S.'s best interests.
A circuit court may permanently terminate a parent's rights to his or her child if the court finds by clear and convincing evidence that termination is in the best interest of the child, that one ground for termination exists, and that there is an appropriate permanency-placement plan for the child. Ark. Code Ann. § 9-27-341(b). When considering whether termination is in the best interest of the child, the circuit court should consider (1) the likelihood that the child will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i),(ii).
Regarding grounds, evidence of only one ground is needed to support TPR. Albright v. Ark. Dep't of Human Servs. , 97 Ark. App. 277, 248 S.W.3d 498 (2007). Here, the ground found by the circuit court that has the least potential for arguable merit is found at section 9-27-341(b)(3)(B)(ii)(a) , which allows for TPR if the child is out of the home of the parent for twelve months, and the parent has willfully failed to provide significant material support in accordance with the parent's means, or the parent has willfully failed to maintain meaningful contact with the child during that time. In order for a circuit court to find willful failure to maintain meaningful contact, the evidence must show that the parent was not prevented from visiting or having contact with the child by the child's custodian or any other person, taking into consideration the distance of the child's placement from the parent's home. Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(b) .
In Mayfield v. Arkansas Department of Human Services , 88 Ark. App. 334, 198 S.W.3d 541 (2004), this court affirmed a finding that a parent failed to maintain meaningful contact with her child when, during the pendency of the child's case, the parent moved out of state to gain financial support from her family but visited her child only when she returned to Arkansas for hearings. Similarly, our supreme court affirmed a finding of willful failure to maintain contact when a father discontinued his court-ordered visitation for almost six months. See Crawford v. Ark. Dep't of Human Servs. , 330 Ark. 152, 951 S.W.2d 310 (1997). Further, in Posey v. Arkansas Department of Human Services , 370 Ark. 500, 262 S.W.3d 159 (2007), our supreme court found willful failure to maintain meaningful contact when the father visited his children only twice, and instead of finding a job in Arkansas so as *452 to be near the children and continue with court-ordered visitation, he decided to leave the state to seek work.
Here, Meisch did not see J.S. even while she was in Arkansas from August 2017 to February 2018, at which time she left for Arizona. Meisch then failed to return to Arkansas for eight months before returning for the TPR hearing. Pursuant to this court's precedent, the evidence constitutes a willful failure to maintain meaningful contact, and there would be no meritorious challenge to the circuit court's finding in that regard.
Addressing the "best interest" prong, counsel maintains that the facts and this court's precedent clearly and convincingly support the circuit court's finding that TPR was appropriate for J.S. First, there was substantial evidence that J.S. would likely find permanency through adoption if Meisch's parental rights were terminated. DHS caseworker Cheryl Taylor testified that the foster parents desired to adopt J.S. should she become available for adoption and that there were otherwise no barriers for her to find permanency through adoption. This is sufficient evidence to satisfy this prong of the "best interest" analysis. See Reed v. Ark. Dep't of Human Servs. , 2010 Ark. App. 416, 375 S.W.3d 709. Likewise, DHS produced more than sufficient evidence of potential harm. In assessing this factor, a court is not required to find that any actual harm will result or to identify a particular harm; instead, the harm analysis is to be conducted in broad terms. Dowdy v. Ark. Dep't of Human Servs. , 2009 Ark. App. 180, 314 S.W.3d 722. As previously described, Meisch chose to move to Arizona, and she ceased contact with DHS. She did not return to Arkansas to attend any hearings, and at the time of the TPR hearing, she had not seen J.S. in over a year. Also, shortly before the TPR hearing, she married a paroled felon who could not yet live with her because of the terms of his parole.
Although Meisch said she left Arkansas to escape the drug lifestyle and to be with people who are a support system for her, the circuit court found that she did not take any initiative once she arrived in Arizona to stay in touch with either J.S. or DHS and that her poor choices left the court with no other option but to find other permanency solutions for J.S. The court found that returning J.S. to Meisch in Arizona, where there are so many "unknowns," would subject J.S. to potential harm. See Harbin v. Ark. Dep't of Human Servs. , 2014 Ark. App. 715, 451 S.W.3d 231 (holding evidence of potential harm sufficient because mother was in relationship with felon, compliance was "eleventh-hour," and mother continuously made decisions contrary to the best interest of her child); Stockstill v. Ark. Dep't of Human Servs. , 2014 Ark. App. 427, 439 S.W.3d 95 (holding evidence of potential harm sufficient where father's housing was uncertain, he missed visitation, and he failed to participate in early part of case). Accordingly, there was ample evidence to satisfy DHS's burden of proof in regard to the "best interest" factor supporting TPR.
B. Other Rulings Adverse to Meisch
The first adverse ruling occurred when DHS counsel asked Meisch about her lease in Arizona: "If I have a document that shows the owners as Ryan Bates and Deanna Dalgreen, do you know who they are?" Meisch's counsel objected because it was speculative and lacked foundation, stating it was unclear whether the document actually existed because of the question's phrasing. The circuit court overruled the objection, finding that it was merely a question as to whether Meisch knew these particular people and that it did not matter *453 whether the document existed-that DHS counsel simply wanted to know if Meisch knew two people with the names Ryan Bates and Deanna Dalgreen.
We agree with counsel that the circuit court's ruling provides no basis for a meritorious challenge. Counsel for DHS was not asking Meisch to speculate, and it did not matter if the document on which the reference to the names was predicated existed. It was simply a question about two people with various names and whether Meisch knew them. Moreover, as the circuit court later pointed out, the objection ultimately became moot after Meisch's counsel subsequently introduced the lease, which cured any issue Meisch's counsel had regarding the source of the names.
The second adverse ruling resulted from an objection to a question asked by the attorney ad litem, who attempted to call Meisch's credibility into question. Meisch testified that her mother had driven her to work. The ad litem then asked Meisch if it would surprise her that her mother had testified at the previous hearing that she had talked to Meisch only a couple of times and had not seen her. Meisch's counsel objected, arguing that it was not relevant and constituted improper impeachment because Meisch could not be responsible for what her mother had said. The circuit court overruled the objection, finding that it went to Meisch's credibility.
We hold that the circuit court's ruling provides no basis for a meritorious challenge. The ad litem used a statement made by Meisch's mother at a previous hearing to attack Meisch's credibility because the prior statement contradicted Meisch's statement. The ad litem simply asked if Meisch would be surprised to know that her mother had given contradictory testimony and gave Meisch an opportunity to explain. However, even had the question been improper, the circuit court's allowance would not amount to reversible error because the remaining evidence was so overwhelmingly against Meisch.
IV. Conclusion
Based on a diligent study of the record, appellate counsel for Meisch, in her professional judgment, believes that the record clearly and convincingly supports the decision of the circuit court to terminate Meisch's parental rights. The statutory requirements were met, and the evidence presented at the TPR hearing established that J.S. could not be returned to Meisch at that time or within a reasonable period of time thereafter. The circuit court correctly applied the law to this case, and any argument challenging the sufficiency of that evidence would be wholly frivolous.
Affirmed; motion to withdraw granted.
Switzer and Hixson, JJ., agree.

The parental rights of J.S.'s father, Frank Sutter, were terminated by the same order, but he is not a party to this appeal.

This occurred after what appears to be an attempt to forward the packet to appellant by the U.S. Post Office. A notation on the envelope by the U.S. Post Office reflects delivery attempts on January 31, February 6, and February 15, 2019, and it was forwarded to an additional address on February 23, 2019. Further notation on the envelope reflects delivery attempts on February 25, March 2, and March 12, 2019.

The caseworker clarified at the TPR hearing that Meisch had actually not seen J.S. in over a year, and Meisch did not dispute this.