Cite as 2019 Ark. App. 503

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-19-544

|  |  |
|---|---|
| RACHEL CHASTAIN | **Opinion Delivered** October 30, 2019 |
| APPELLANT | APPEAL FROM THE HOT SPRING COUNTY CIRCUIT COURT [NO. 30JV-16-158] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE EDDY EASLEY, JUDGE |
| | AFFIRMED |
| APPELLEES | |

## LARRY D. VAUGHT, Judge

Rachel Chastain appeals the order entered by the Hot Spring County Circuit Court terminating her parental rights to her daughter MC (born January 5, 2010). Rachel argues that the circuit court clearly erred in finding grounds to support termination and that termination was in MC's best interest. We affirm.

On November 21, 2016, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect after removing MC from the custody of her father Cole Cragg.[1] MC had been living with her father, his wife Lesley Cragg, and MC's

---

[1]In an April 26, 2014 order, the Baxter County Circuit Court awarded Cole custody of MC. This order also awarded Rachel supervised visitation and directed her to pay child support.

half sister AC.[2] An affidavit attached to the petition stated that the Cragg home was under construction and unsuitable to live in, a sex offender was living in the home, Lesley tested positive for methamphetamine, and Cole refused drug testing. An ex parte order for emergency custody of MC was entered November 21.

On February 2, 2017, an adjudication order was entered finding MC dependent-neglected due to neglect and parental unfitness based on Cole's stipulation. The court noted that Rachel, as the noncustodial parent, did not contribute to the dependency-neglect of MC but that her whereabouts were unknown and that she was not a fit parent for purposes of custody.

Rachel's first attendance in the dependency-neglect proceeding is reflected in the circuit court's November 15, 2017 permanency-planning order. In that order, the court authorized a plan of adoption with DHS filing a petition for termination of Cole's parental rights to MC. While the court also found that the concurrent goal of permanent custody with Rachel was appropriate, it further found that Rachel, who had been living in Washington, had recently moved to Arizona; did not advise DHS of her new address and phone number; had little contact with MC over the last several years; and had not completed a home study. The circuit court appointed Rachel counsel and ordered her to come to Arkansas to visit MC.

On December 29, 2017, the circuit court entered an order terminating Cole's parental rights to MC and AC and Lesley's parental rights to AC. In this order, the circuit court ordered DHS to continue reunification services for Rachel, who attended the termination hearing. The

[2]DHS filed a separate petition for emergency custody and dependency-neglect on November 21, 2016, after it had removed AC (born October 30, 2013) from the custody of Cole (her father) and Lesley (her mother).

2

court also ordered Rachel to contact her local state representative and senator to request that the home study be expedited by child services in Arizona.

On March 6, 2018, the court held a review hearing with Rachel. In the review order, the circuit court found that Rachel had partially complied with the case plan but had little contact with MC and had not participated in family counseling. The court noted the continued need for the completion of the home study. The court continued the goal of reunification but authorized DHS to file a petition for termination of Rachel's parental rights. A termination hearing was set for May 22, 2018.

On March 29, DHS filed a petition for termination of Rachel's parental rights to MC. DHS alleged that four grounds supported termination: (1) failure to remedy the issues that prevent reunification, Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)*(b)* (Supp. 2017); (2) failure to maintain meaningful contact or provide material support, section 9-27-341(b)(3)(B)(ii)*(a)*; (3) subsequent factors, section 9-27-341(b)(3)(B)(vii)*(a)*; and (4) aggravated circumstances, section 9-27-341(b)(3)(B)(ix)*(a)(3)(A)*, *(B)(i)*. DHS also alleged that termination was in the best interest of MC.

On May 22, rather than a termination hearing, the circuit court held another review hearing. In the review order, the court again found that Rachel, who attended the hearing, had partially complied with the case plan but had little contact with MC and had not participated in family counseling. The court noted the continued need for the completion of the home study.

The termination hearing was held on December 4, 2018. Sandra Hinton testified that there are 307 potential adoptive matches for MC and AC as a sibling group, that her success

rate with adopting sibling groups similar to MC's and AC's ages is very good, and that she is not aware of any barrier that would prevent the adoption of MC and AC.

Rachel testified that in August 2014, Cole was awarded custody of MC "by default" because he told her the wrong time for the custody hearing, and she missed it. She said that when Cole had custody of MC from August 2014 to November 2016, Rachel saw MC only two times because Cole prevented her from exercising her visitation by moving MC out of Arkansas. Rachel stated that she was living in Washington and did not have the means to hire an attorney to enforce her visitation rights. She testified that she did not pay child support because she did not know where Cole and MC lived.

Rachel further testified that she discovered MC was in foster care in February 2017 but did not make a court appearance in this case until July 2017. Because she was living in Washington, she requested DHS to have a home study conducted there. Rachel said that she moved to Arizona in September 2017. She admitted that she did not tell DHS that she had moved until a month and half later. She testified that she called the Arizona DHS equivalent three times about conducting a home study.

Rachel stated that since December 2014, she has seen MC one time—on July 25, 2017—at a dependency-neglect hearing. She was told that the visit upset MC, and family counseling was ordered. Rachel said that she could not afford to travel to Arkansas from Arizona for family counseling. Rachel stated that she wanted to visit with MC, but DHS would not allow it. Rachel testified that she had not provided MC any financial support or spoken to MC on the phone during the dependency-neglect proceeding. Rachel also said that she had

purchased birthday gifts for MC but that she had not sent them. She admitted that she has no relationship with MC.

DHS caseworker Kaylen Coke testified that MC had been taken into DHS care in November 2016 and that Rachel's first appearance in the dependency-neglect proceeding was in July 2017. At that time, Rachel requested that MC be placed in her custody in Washington. In September 2017, DHS requested a home study in Washington. Kaylen testified that Rachel moved to Arizona without notifying DHS and that the Washington home study was canceled. DHS requested a home study in Arizona in November 2017 and a second Arizona home study in November 2018; however, the home study has not been conducted.

Kaylen said that the prior caseworker and the attorney ad litem suspended visitation after MC had a negative reaction to her July 2017 visit with Rachel. Kaylen said that Rachel's Arizona residency has been a barrier to her participating in the case and that Rachel has not built a relationship with MC. Kaylen stated that she has not received any calls from Rachel to check in on MC. According to Kaylen, MC has had stability with AC and her foster family since November 2016. Kaylen further testified that DHS was recommending termination due to Rachel's lack of a relationship with MC along with her lack of stability.

Jennifer Embry, MC's therapist, testified that she has been treating MC since February 2017. Jennifer diagnosed MC with adjustment disorder with mixed anxiety and depressed mood but added that MC has improved and is doing well. Jennifer stated that she was asked to contact Rachel to set up family counseling and that she had difficulty communicating with Rachel because the phone number she had for Rachel was incorrect. When Jennifer was able to schedule a phone conference with Rachel in May 2018, Rachel did not keep the

appointment. Jennifer said that she had phone sessions with Rachel in June and July 2018 but that there was no communication from Rachel until October 2018 when Rachel left a message for Jennifer with a new phone number that Jennifer could not hear. The last phone session Jennifer had with Rachel was in November 2018.

Jennifer stated that she reported to Rachel the first time they spoke on the phone that she could not provide family therapy over the phone; face-to-face contact is required. Jennifer further stated that she recommends family counseling one or two times a month. Jennifer said Rachel did not participate in family counseling, and the fact that Rachel lived 1,300 miles away was an obstacle that could not be overcome by accommodation. Jennifer opined that a lack of contact over a significant period of time could hinder a parent's ability to meet the emotional needs of a child.

On March 21, 2019, the court entered an order terminating Rachel's parental rights to MC and finding that DHS had proved all four of the grounds alleged in its petition and that termination was in MC's best interest. Rachel filed a timely appeal of this order.

A circuit court's order terminating parental rights must be based on findings proved by clear and convincing evidence. *Bolden v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 218, at 7, 547 S.W.3d 129, 133 (citing *Krecker v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 537, at 10, 530 S.W.3d 393, 400; Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2017)). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Bolden*, 2018 Ark. App. 218, at 7, 547 S.W.3d at 133. On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.*, 547

6

S.W.3d at 133. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*, 547 S.W.3d at 133. In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*, 547 S.W.3d at 133. The appellate court is not to act as a "super factfinder," substituting its own judgment or second-guessing the credibility determinations of the circuit court; we reverse only in those cases in which a definite mistake has occurred. *Id.*, 547 S.W.3d at 133–34.

In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B).

Rachel first argues that the circuit court clearly erred in finding that DHS proved the four grounds alleged in its petition to terminate her parental rights. One of the grounds that the circuit court found supported termination is the failure-to-maintain-meaningful-contact ground set forth in section 9-27-341(B)(3)(B)(ii)*(a)*, *(b)*:

> (ii)*(a)* The juvenile has lived outside the home of the parent for a period of twelve (12) months, and the parent has willfully failed to provide significant material support in accordance with the parent's means or to maintain meaningful contact with the juvenile.

*(b)* To find willful failure to maintain meaningful contact, it must be shown that the parent was not prevented from visiting or having contact with the juvenile by the juvenile's custodian or any other person, taking into consideration the distance of the juvenile's placement from the parent's home.

In concluding that Rachel failed to maintain contact with MC, the court found that Rachel did not exercise her visitation rights after Cole was awarded custody of MC in August 2014. The court noted Rachel's testimony that Cole would not let her see MC, but the court found that Rachel did not take any legal action to enforce her visitation rights. The court further found that Rachel has had only one visit with MC since MC has been in DHS custody, Rachel has not sent the birthday presents she had purchased for MC, Rachel does not know what grade MC is in, Rachel has made little effort to check with DHS or MC's therapist to see how MC is doing, and Rachel has made little effort to maintain a relationship with MC.

In *Mayfield v. Arkansas Department of Human Services*, 88 Ark. App. 334, 341, 198 S.W.3d 541, 546 (2004), this court affirmed a finding that a parent failed to maintain meaningful contact with her child for eleven months when, during the pendency of the child's case, the parent moved out of state to gain financial support from her family but visited her child only when she returned to Arkansas for hearings. We held that the parent voluntarily left Arkansas while her child was in foster care and that she refused to return to the state or avail herself of DHS services. *Id.*, 198 S.W.3d at 546. Similarly, our supreme court affirmed a finding of willful failure to maintain contact when a father discontinued his visitation for almost six months so that his children could get used to his not being around because he was going to prison. *Crawford v. Ark. Dep't of Human Servs.*, 330 Ark. 152, 157–58, 951 S.W.2d 310, 313–14 (1997).

In *Posey v. Arkansas Department of Human Services*, 370 Ark. 500, 508, 262 S.W.3d 159, 165–66 (2007), our supreme court affirmed a finding of willful failure to maintain meaningful

8

contact when the father visited his children only twice in a six-month period when he was not in prison, and instead of finding a job in Arkansas to be near his children and continue with court-ordered visitation, he decided to leave the state to seek work. Finally, in *Meisch v. Arkansas Department of Human Services*, 2019 Ark. App. 283, at 12, 577 S.W.3d 444, 451–52, we affirmed the circuit court's no-meaningful-contact finding based on evidence that the mother had not seen her child for six months before she voluntarily moved to Arizona and had not seen her daughter in over a year at the time of the termination hearing.

Considering this case law and the evidence in this case, we hold that the circuit court did not clearly err in finding that Rachel failed to maintain meaningful contact with MC. From December 2014 to the termination hearing in December 2018—four years—Rachel has visited with MC only one time in July 2017. At the December 2018 termination hearing, Rachel had not seen MC in sixteen months. Significantly, Rachel admitted that she has no relationship with MC.

We reject Rachel's argument that she was prevented from having meaningful contact with MC because DHS required her to first complete family counseling, which she claims was virtually impossible because she lives 1,300 miles from Arkansas. During this dependency-neglect proceeding, Rachel moved from Washington to Arizona and did not offer any reason why she did not return to Arkansas where MC is in foster care. Rachel learned in February 2017 that MC was in DHS custody, yet the first time Rachel visited MC was five months later in July 2017 following a hearing in this case. The record is clear that Rachel made no effort whatsoever to either contact or communicate with MC in any other manner. There is no evidence that Rachel called MC in her foster placement, Rachel did not mail the gifts she said

she had purchased for MC, Rachel did not provide any financial support to MC, and Rachel did not send letters or cards to MC. According to Jennifer and Kaylen, Rachel did not keep in good contact with them, and Rachel did not call them to check in on MC. Rachel knew she had to have in-person family counseling with MC, yet she provided no evidence of how she attempted to comply with that directive other than claiming that she could not afford to travel that far. While Rachel contends that she was prevented from visiting MC because of the distance between Arizona and Arkansas, the evidence shows that she was able to travel to Arkansas multiple times to attend hearings in this case.

These facts demonstrate that Rachel was not prevented by DHS or anyone else from maintaining contact with MC. These facts demonstrate that for a long time—well before this dependency-neglect case—Rachel has made little to no effort to maintain a relationship with MC. Accordingly, we affirm the circuit court's finding that DHS proved the no-meaningful-contact ground in support of termination. Only one ground must be proved to support termination. *Bolden*, 2018 Ark. App. 218, at 8, 547 S.W.3d at 134. Therefore, we need not address Rachel's arguments regarding the other grounds.

Rachel also argues that the circuit court clearly erred in finding termination is in MC's best interest. Rachel does not challenge the circuit court's adoptability finding. Instead, she contends that there is a lack of evidence that MC would be subjected to potential harm if returned to Rachel's custody. In assessing the potential-harm factor, a court is not required to find that any actual harm will result or to identify a particular harm; instead, the harm analysis is to be conducted in broad terms. *Meisch*, 2019 Ark. App. 283, at 13, 577 S.W.3d at 452.

We hold that the circuit court did not clearly err in finding termination is in MC's best interest. As set forth above and as admitted by Rachel, she has no relationship with MC. Rachel has seen MC one time in four years. The last time Rachel did see MC was for a two-hour visit in July 2017, and MC had a negative response to the visit. The lack of a relationship or bond between a parent and child can properly inform a circuit court's potential-harm finding. *Norris v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 571, at 10, 567 S.W.3d 861, 867 (affirming a potential-harm finding where there was a lack of bond between the father and his child along with other evidence of the father's lack of effort in contacting and visiting the child); *Fraser v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 395, at 10, 557 S.W.3d 886, 893 (affirming potential-harm finding based partly on evidence that the father and his child had "no relationship" and "no bond"); *Brumley v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 90, at 13, 455 S.W.3d 347, 355–56 (affirming potential harm-finding based in part on evidence that the father had no relationship with his child and the child had bonded to his foster family).

Moreover, Rachel lacks stable income. She is unemployed and currently relies on her mother and boyfriend for financial support for her and her four other children. She said that for the past five to seven years she has relied on others for her family's financial support. *Lewis v. Ark. Dep't of Human Servs.*, 364 Ark. 243, 254, 217 S.W.3d 788, 796 (2005) (the lack of stable income can inform a circuit court's potential-harm finding); *Banks v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 53, at 7 (same).

Finally, the evidence is undisputed that MC is extremely close with her half sister AC, that MC sees herself as AC's protector, that MC and AC have been in foster care together during their dependency-neglect cases, that the parental rights of AC's parents have been

11

terminated, and that MC and AC can be adopted together. There is also evidence that MC and AC have had stability together since being placed in foster care. Keeping siblings together is an important consideration when making a best-interest analysis. *See Brown v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 370, at 10–11 584 S.W.3d 276, 282. Accordingly, we hold that the circuit court did not clearly err in finding that termination of Rachel's parental rights is in MC's best interest.

Affirmed.

GRUBER, C.J., and WHITEAKER, J., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.