Cite as 2023 Ark. App. 392

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CV-23-86

| | |
|---|---|
| RANDY HUTCHINS<br><br>APPELLANT<br><br>V.<br><br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | Opinion Delivered September 20, 2023<br><br>APPEAL FROM THE FRANKLIN COUNTY CIRCUIT COURT, SOUTHERN DISTRICT<br>[NO. 24CJV-20-13]<br><br>HONORABLE KEN D. COKER, JR., JUDGE<br><br><br>AFFIRMED |

**RITA W. GRUBER, Judge**

Randy Hutchins appeals the November 18, 2022 order of the Franklin County Circuit Court terminating his parental rights to a minor child (MC) born September 2020. Randy raises two points on appeal: (1) the Arkansas Department of Human Services (DHS) did not prove statutory grounds by clear and convincing evidence; and (2) termination of his parental rights was not in MC's best interest. We affirm.

I. *Factual and Procedural Background*

On September 17, 2020, DHS filed a petition for emergency custody and dependency-neglect, having taken custody of MC pursuant to a seventy-two-hour hold on September 14. The petition identified Heather Hudson[1] as MC's mother and Randy as the

---

[1]Hudson's rights were terminated pursuant to a July 15, 2022 order; however, she is not party to the appeal.

putative father. The petition was supported by an affidavit by family service worker (FSW) Patricia Mitchell, which set out that MC was taken into DHS custody when MC and Hudson both tested positive for opioids at MC's birth. Mitchell went to Hudson's home address looking for Hudson, where she encountered a woman who identified herself as Terry Hutchins. Terry explained that she and Randy were married and owned the property; Hudson lived in the house behind theirs; and she and Randy had been trying to help Hudson get clean and on the right track for several years. Terry said it was rumored that Randy was MC's biological father, which was not true, but they were going to speak to an attorney about seeking guardianship over MC. Mitchell was concerned that the Hutchinses' home was not suitable for a child to reside in because of the presence of a strong ammonia odor and puppy pads covered in urine and feces inside the home.[2] Randy informed Mitchell that he could be MC's father. Mitchell also spoke to Hudson, who identified Randy as MC's father.

The September 17 ex parte order found that there was probable cause that MC was dependent-neglected, placed her in DHS custody, and set a probable-cause hearing. The October 12 probable-cause order continued MC in DHS custody, ordered Randy to submit to a paternity test, and ordered DHS to conduct a study on the Hutchinses' home. Randy retained counsel and on October 14 filed a motion asserting that MC carries his surname; he believes he is MC's biological father and that he and Hudson had executed and filed an acknowledgment of paternity (AOP) with the Arkansas Department of Health, Bureau of

---

[2]Terry reported that she rescued racoons and kept them as pets.

Vital Records; and the AOP was sufficient to establish that he is MC's biological father. He contended that he was willing and able to take care of MC and requested that DHS "recognize his claim and either place temporary custody with him or to begin visitation between himself and his daughter, working towards permanent custody."

In the October 15 adjudication order, the circuit court adjudicated MC dependent-neglected based on parental unfitness due to Hudson's drug use and again ordered Randy to submit to a paternity test. On October 28, 2020, Randy took a paternity test, the results of which reflected a 0.00 percent probability that Randy is MC's biological father. Those results were entered into evidence at the December 2020 review hearing. Orders entered December 11, 2020, March 12, 2021, and July 9, 2021, reflected that review hearings were held via Zoom, none of which Randy attended. On August 30, 2021, the AOP and MC's birth certificate were filed in the circuit court.

The November 2, 2021 permanency-planning order provided that genetic testing had shown that Randy is not MC's biological father; he had objected to those results and requested a second test; and a second test would be facilitated. However, the order further stated that "until such time as there is proof that Randy Hutchins is the biological father of the juvenile, he is not a parent or a putative parent pursuant to the Juvenile Code, and he shall not be made a party to this case." The order also reflected that Hudson was still residing on the Hutchinses' property, and there was a history of conflict between Terry and Hudson that had become physical at least once in August 2021, two days into MC's trial home placement with Hudson, which ultimately lasted less than a week.

A second permanency-planning hearing was held January 26, 2022, at which FSW Cheryl Warden testified that two DNA tests had shown Randy is not MC's biological father. Further, MC had not had any significant contacts with Randy. Warden testified that she had spoken to Randy while at the Hutchinses' property looking for Hudson, and he had not seen her since December 23. DHS recommended that the goal be changed to adoption and requested a termination-of-parental-rights (TPR) hearing. The ad litem concurred. The second permanency-planning order was filed March 1, 2022, and changed the goal to adoption. On April 8, DHS filed a petition to terminate Hudson's parental rights, setting out in relevant part that the court had previously found Randy is not MC's biological father and is not a parent because paternity testing has excluded him as a father. The petition also referenced the volatile relationship between Hudson and Terry, stating that, despite DHS's attempts to assist Hudson in finding other housing, she had continued to return to the Hutchinses' property throughout the case—albeit not recently.

On July 12, 2022, DHS moved to join Randy as a necessary party, asserting that while DNA testing established he is not MC's biological father, he is a "parent" under the Juvenile Code, and complete relief cannot be accorded to the parties in his absence. That same day, DHS filed a TPR petition with respect to Randy's parental rights pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(iii) (Supp. 2023), alleging that Randy is not MC's biological parent, and her welfare could best be served by the termination; and termination is in MC's best interest.

On July 14, the court entered a finding that Randy is a "parent" as defined by the Juvenile Code based on MC's birth certificate and the AOP. The court further found that complete relief in the form of permanency for MC could not be achieved in his absence. On August 18, Randy moved to dismiss the petition and for immediate custody, asserting that he is a legal nonoffending parent of MC, and the continued deprivation of his daughter was a violation of his due-process rights. Randy alleged that he was "only established as a legal parent on July 14, 2022." He further alleged that prior to that date, DHS had thwarted all his attempts to be reunited with MC; no services had been offered to him since he was found to be the legal parent; and DHS sought to terminate his rights on the same day they were established—July 14. The motion requested that the court grant immediate custody to Randy—without the need for a home study—and a dismissal of the petition.

On August 19, DHS filed a new petition requesting an order declaring that Randy is not the biological father of MC, setting aside the previous finding that he is a parent, and ordering that his name be removed from MC's birth certificate. On August 22, DHS responded to Randy's motion to dismiss, denying he was entitled to custody of MC, that he had any constitutional rights with respect to MC, or that he was entitled to any services. DHS reiterated its allegations in support of terminating Randy's rights as set forth in the TPR and affirmatively pled that Randy is considered MC's parent due only to a material mistake of fact and not pursuant to either biology or the establishment of putative rights through significant contact, support, or relationship. On August 23, Randy responded to

DHS's August 19 petition, admitting that he had believed he is MC's biological father but denied it was a material mistake of fact or that DHS had standing to request such relief.[3]

The termination hearing was held October 26, 2022. The November permanency-planning (PPH) order in which the court found Randy is not the biological parent of MC was entered into evidence, as was her birth certificate, the AOP, and the paternity-test results. FSW Warden testified that she has been the caseworker on the case since it began. MC has been in a traditional foster placement for the last eighteen months, in which she has been doing well. She has medical conditions requiring speech, physical, and occupational therapy, all of which her foster parents are aware of and manage. She is adoptable, and her current placement has expressed interest in adopting her. MC has not had any contact with Randy in over a year and would be at risk if she was placed with him. DHS had looked at placing MC with Randy and his wife, and a home study was done in September 2020. They were asked to improve their home; DHS returned to the home after the improvements were requested, and it still could not safely accommodate a child—it was not clean and appropriate. Thus, MC could not be placed with them, and they did not contact DHS afterward to have DHS look at their home again. MC would be psychologically harmed if placed in Randy's

---

[3]If a paternity test is administered and "excludes the adjudicated father or man deemed to be the father pursuant to an acknowledgment of paternity as the biological father of the child and the court so finds, the court shall: . . . set aside the previous finding or establishment of paternity," and if "the name of the adjudicated father or man deemed to be the father pursuant to an acknowledgment of paternity appears on the birth certificate of the child, the court *shall* issue an order requiring the birth certificate to be amended to delete the name of the father." Ark. Code Ann. § 9-10-115(f)(1)(A), (2) (Repl. 2020).

6

home because she does not know him, does not ask about him, and it would be a "shock" to her—they were strangers to one another. Warden admitted that DHS oversaw who was permitted to see MC, and during Hudson's short-lived visitation and trial home placement, Randy would spend a few minutes of Hudson's visitation with MC. DHS never received any kind of communication from Randy or his attorney requesting visitation after Hudson's visitation ceased.

Warden testified further that there was a concern that Hudson would continue "coming around." Additionally, Randy and Terry "were on medication" that Warden believed was "morphine," which neither disclosed to DHS, and was Hudson's "drug of choice." Since the November PPH order was entered, Randy had not contacted DHS for services, to request visitation, or to inquire about providing MC with child support, birthday cards, Christmas gifts, or other support. No further services were offered to Randy because the home study and paternity test had already been done, and the court did not order any.

Randy testified that Hudson had been staying on his farm and working for him and at another farm next door. There are two houses on his farm—an old one that he lives in and a newer one in which Hudson lived. He provided Hudson housing, food, and vitamins while she was pregnant. He completely remodeled the house Hudson lived in so it would be fit for a child, and DHS "passed" that house. He claimed DHS had not been in the old house and that Hudson moved out of the new house because DHS thought there was too much animosity between Hudson and Randy's wife. He visited with MC the day she was born. When the caseworker brought MC to the property for Hudson's visitation, he would see MC

for fifteen to thirty minutes, but it was never for a full visit. DHS controlled the quality and quantity of his visitation. He wanted to see his daughter and asked for formal visitation several times but never received it.

Randy testified further that he knew from the day that Hudson got pregnant that it could have been his child, and he did not care that MC was not his biological child. He just wanted MC to have a loving home. Neither he nor Hudson revoked the AOP, which was executed prior to the DNA testing, which he did not want. His wife was "not okay" with the situation at the beginning, but they reconciled when he "did" the AOP. His wife "came to deal with it pretty well" and helped him remodel the house. He does not want to give up his rights to MC because he has an emotional attachment to her as well as "a pretty big financial investment" in her. DHS never told him he needed to provide any items for MC, but he and his wife provided clothes for MC and donated baby clothing and formula to DHS. He did not do anything to cause the removal of MC. They asked for fictive-kin placement, but DHS was not responsive to him. He is still married, and his wife is not related to Hudson.[4] He denied that he needed services.

The court appointed special advocate report recommended that Randy's rights be terminated and was entered into evidence. DHS argued that it had proved grounds and best interest. DHS also argued that Randy does not qualify for fictive-kin placement under the code because MC had never lived with him. Randy asserted in his closing argument that his

---

[4]His wife did not attend or testify at the TPR hearing or any prior hearing.

due-process rights were violated. DHS responded that his failure to appeal the November PPH order mooted that argument. The attorney ad litem joined DHS's arguments. Randy requested that the parties be able to submit posttrial briefs on the due-process issue. All parties and the court agreed that this was a novel case, the court set a deadline for submitting the briefs, and it took the matter under advisement.

On November 9, Randy filed his brief, arguing that as of the July 14, 2021 finding that he is MC's parent, he had been entitled to—but was denied—due-process protections. DHS responded that same day, arguing that the birth certificate and the AOP were both executed within weeks of MC's birth and DHS's taking emergency custody of her, and the clear and convincing evidence was that Randy is not MC's biological father. It further argued that the court made a finding that Randy is not MC's biological father and dismissed Randy from the case in the November PPH order, which was final and appealable pursuant to Arkansas Supreme Court Rule 6-9, and Randy failed to appeal it. Thus, a ground to terminate existed and was incontrovertible; and it is in MC's best interest to terminate. Regarding potential harm, DHS argued that MC had been in DHS custody and foster care since birth and had never lived with or formed any type of relationship with Randy; MC has medical conditions that require specialized care; and her foster parents are aware of those needs and willing and capable to facilitate such care. DHS asserted that the court should find that MC's welfare can be best served by terminating Randy's rights, and it is in MC's best interest to do so, considering her adoptability and the potential harm to her if she were placed in his care. In response to Randy's argument that he should have been offered

reunification services, DHS argued that his failure to appeal the November PPH order precluded him from arguing lack of services, and the provision of services is not an element of the ground alleged against him.

On November 15, 2022, the court denied DHS's petition to revoke the parent finding because DHS lacked standing. On November 18, the order terminating Randy's parental rights was entered. The court found that Randy is MC's parent as defined by the Juvenile Code because he is listed on her birth certificate, and he and Hudson executed the AOP. The court further found that clear and convincing evidence proved that Randy is not the biological parent of MC, and MC's welfare may best be served by terminating Randy's parental rights pursuant to the ground found at Arkansas Code Annotated section 9-27-341(b)(3)(B)(iii) (Repl. 2023), given that he did not appeal the November PPH order and had not communicated with DHS since entry of that order. The court also found that MC had been in a stable placement for the past eighteen months with foster parents who are knowledgeable of her special needs and therapies, are experienced and capable of tending to her special needs, and wish to adopt her. The court additionally found that clear and convincing evidence proved that it is in MC's best interest to terminate Randy's rights, given that she is adoptable and would be subjected to potential harm if Randy's rights were not terminated because he is not her biological parent, has never lived with or formed a relationship with her, and is neither aware of nor experienced with her special needs and therapies. The court found that MC would be subject to psychological harm if placed in Randy's home at this point in her life and that DHS made reasonable efforts to provide

appropriate family services to the family. No findings or rulings were made regarding Randy's due-process arguments. Randy filed a notice of appeal regarding the termination and all adverse rulings made therein on December 9, 2022. Randy filed an amended notice of appeal on December 21, 2022, designating that he was appealing the November 2, 2021 and November 18, 2022 orders of the court with respect to permanency planning and the termination of his parental rights.

## II. *Standard of Review*

We review termination-of-parental-rights cases de novo. *Dinkins v. Ark. Dep't of Hum. Servs.*, 344 Ark. 207, 213, 40 S.W.3d 286, 291 (2001). The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Shawkey v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 2, at 4, 510 S.W.3d 803, 806. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. *Bentley v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 374, at 5, 554 S.W.3d 285, 289.

Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights. *Id.* However, the intent behind the termination-of-parental rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3) (Supp. 2023); *Lyall v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 81, at 15, 661 S.W.3d 240, 250. As such, parental rights will not be enforced

to the detriment or destruction of the health and well-being of the child. *Bentley*, 2018 Ark. App. 374, at 5, 554 S.W.3d at 289.

To terminate parental rights, DHS must prove by clear and convincing evidence that a minimum of one statutory ground exists and that it is in the child's best interest to do so. Ark. Code Ann. § 9-27-341(b)(3)(A), (B). Clear and convincing evidence is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. *Bentley*, 2018 Ark. App. 374, at 4–5, 554 S.W.3d at 289. In finding that termination is in the best interest of the child, the circuit court is required to consider the likelihood that the child will be adopted if the petition is granted and the potential harm to the health and safety of the child that might result from returning the child to the parent's custody. Ark. Code Ann. § 9-27-341(b)(3)(A).

It is the overall evidence—not proof of each factor—that must demonstrate that termination is in the child's best interest. *Cole v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 481, at 9, 611 S.W.3d 218, 223. This court has held that other factors to be considered in making a best-interest finding may include whether the child is living in continued uncertainty. *Id.* at 11, 611 S.W.3d at 224. The court is not required to find that actual harm would result or to affirmatively identify potential harm. *Dowdy v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 180, at 12, 314 S.W.3d 722, 728. The potential-harm evidence must be viewed in a forward-looking manner and considered in broad terms. *Samuels v. Ark. Dep't of Hum. Servs.*, 2014 Ark. App. 527, at 5, 443 S.W.3d 599, 603.

III. *Points on Appeal*

Randy's first point on appeal is that DHS did not prove the statutory ground by clear and convincing evidence. The only ground DHS asserted was that Randy is not the biological parent, and MC's welfare could best be served by the termination. Termination is permitted when the "parent is not the biological parent of the juvenile and the welfare of the juvenile can best be served by terminating the parental rights of the parent." Ark. Code Ann. § 9-27-341(b)(3)(B)(iii). Proof of only one statutory ground is sufficient to terminate parental rights. *Corley v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 397, at 4–5, 556 S.W.3d 538, 541–42. It is undisputed that Randy is not MC's biological child, and for the reasons more fully set forth below with respect to best interest, MC's welfare is best served by the termination. Regarding the provision of services, the ground pled does not require that DHS provide them, and Randy's testimony was that he did not need services. We hold that there was clear and convincing evidence of the ground asserted.

Randy's second point on appeal is that termination of his rights is not in MC's best interest. In making a best-interest determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential harm to the child if custody is returned to a parent. *Easter v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 441, 587 S.W.3d 604. On appeal, Randy does not challenge the adoptability finding, so we address only the potential-harm prong of the circuit court's best-interest finding. In considering potential harm caused by returning a child to the parent, the circuit court is not required to find that actual harm would result. *Middleton v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 97, 572 S.W.3d 410. Potential harm must be viewed in broad terms, including

the harm the child suffers from the lack of stability in a permanent home. *Id.* The circuit court found that termination of Randy's rights was in MC's best interest because MC would be subjected to the following potential harm: Randy is not her biological parent; she has never lived with nor formed a relationship with Randy; and Randy is not aware of nor experienced with MC's special needs and therapies, such that MC would be at a significant risk of psychological harm if placed in his home at this point in her life.

It is undisputed that Randy is not MC's biological parent; she has never lived with or formed a relationship with him; and he is neither aware of nor experienced with MC's special needs and therapies. Moreover, while the court did not rely on this in its termination order, the record reflects that the Hutchinses' home was never found to be clean and appropriate for a child, despite direction from DHS to make it so and subsequent review by DHS. The record further reflects that the stability of the environment at the Hutchinses' home is questionable, given the volatile relationship between Randy's wife and Hudson and DHS's concern that Hudson would continue to come around the Hutchinses' home. Further, despite Randy's testimony that his wife was "okay" with the situation and they had reconciled, his wife, with whom he still resides, did not attend or testify at any of the hearings regarding MC.

Randy argues that he should never have been dismissed from the case. He is not wrong that he met the definition of "the father of a child" pursuant to Arkansas Code Annotated section 9-27-303(41)(C)(ii), (iv) (Supp. 2023) because he and Hudson executed the AOP, and he was identified as MC's father on her birth certificate after DHS had

14

obtained custody of MC. However, he was dismissed from the case pursuant to the November PPH order, which he failed to timely appeal. Regardless of whether the circuit court may have erred, the fact remains that Randy failed to timely appeal this issue. *See* Ark. R. App. P.–Civ. 2(c)(3)(B) (2022); Ark. Sup. Ct. R. 6-9(a)(1)(B) (2022).

In support of his arguments, Randy relies on the concurring opinions in two cases: *Otis v. Arkansas Department of Human Services*, 2018 Ark. App. 28, 538 S.W.3d 870, and *Dominguez v. Arkansas Department of Human Services*, 2020 Ark. App. 2, 592 S.W.3d 723. The concurring opinion in *Otis* took issue with the circuit court's dismissal of the child's "father" (Otis), who was not party to the appeal, and who had been married to the child's mother at the time of the child's birth but had been biologically excluded during the case. *Otis*, 2018 Ark. App. 28, at 10–11, 538 S.W.3d at 876–77 (Gruber, J., concurring). The concurrence set out that Otis's rights should have been terminated and specifically stated that it did not take issue with the circuit court's best-interest finding. *Id.* at 10, 538 S.W.3d at 876. Moreover, the majority opinion pointed out that Otis did not appeal the order that dismissed him as a party. *Id.* at 8–9, 538 S.W.3d at 875.

In *Dominguez*, the appellant mother argued that termination was not in the child's best interest because placing the child with a nonbiological but perhaps legal stepfather (Javier), who was not a party to the appeal, was a less-restrictive alternative. The concurrence's concern was with the circuit court's finding that Javier had no rights to terminate because Javier was potentially a parent as defined by the Juvenile Code and may have had rights that required further adjudication prior to the child's being cleared for adoption. 2020 Ark. App.

2, at 25, 592 S.W.3d at 737 (Harrison, J., concurring). Neither case is applicable here. Both cases were concerned with individuals who were found *not* to be parents under the Juvenile Code and thus had no rights to terminate. However, here, Randy was ultimately found to be a parent.

Randy further contends that the termination violated his due-process rights. While he raised that argument to the circuit court, no ruling specific to it was obtained. The failure to obtain a ruling from the circuit court is fatal to the appellate court's consideration of an issue on appeal, even in termination cases. *See Hile v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 173, at 7. Thus, we are unable to consider this argument.

Termination cases are unique civil cases because time is viewed from the juvenile's perspective, and the best interest of the child takes precedence at every stage of the proceedings. *See Turner v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 52, at 5, 539 S.W.3d 635, 638. Parental rights will not be enforced to the detriment or destruction of the health and well-being of the child, and to reverse this case would be contrary to MC's best interest—she has been in foster care her entire life and deserves permanency. *See, e.g.*, *Chastain v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 503, at 12, 588 S.W.3d 419, 426. As such, we cannot say there is clear error in the circuit court's finding of potential harm. Accordingly, we affirm the circuit court's termination of parental rights.

Affirmed.

GLADWIN and MURPHY, JJ., agree.

*DeeAnna Weimar*, for appellant.

16

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.