LARRY D. VAUGHT, Judge
Kimberly Bentley appeals the order entered by the Sebastian County Circuit Court terminating her parental rights to her daughter, C.J. (born July 3, 2014). On appeal, Bentley argues that the circuit court clearly erred in finding that the Arkansas Department of Human Services (DHS) proved grounds to support the termination order and that termination was in C.J.'s best interest. We affirm.
On September 8, 2014, DHS filed a petition for emergency custody and dependency-neglect, alleging that on September 5, 2014, it had exercised a seventy-two-hour hold over then two-month-old C.J. The affidavit attached to the petition alleged that on September 5th, C.J. had been taken to the emergency room where it was discovered that she had injuries consistent with shaken-baby syndrome along with a healing clavicle fracture. The affidavit further alleged that C.J. had been in the care of Bentley and her live-in boyfriend, Jacob Jeffrey; that Bentley had reported that C.J. had choked on her formula, went *288 limp, and stopped breathing; and that the history reported was not consistent with C.J.'s injuries. An ex parte order for emergency custody was entered on September 8, 2014, and a probable-cause order was entered on October 2, 2014.
An adjudication hearing was held on October 30, 2014, during which Dr. Karen Farst of Arkansas Children's Hospital testified. Dr. Farst stated that C.J. suffered from bilateral subdural hematomas and severe retinal hemorrhaging that were nonaccidental and were caused by violent shaking. Dr. Farst testified that C.J. also suffered from broken bones in her legs and collarbone and that at least one of the leg fractures was caused by abuse. Dr. Farst stated that the abuse endured by C.J. placed her life in danger. Based on Dr. Farst's testimony, the circuit court found that C.J. was dependent-neglected due to the substantial risk of harm as a result of physical abuse. The court ordered Bentley to comply with the case plan, which included: demonstrating improved parenting skills; complying with any counseling recommendations by her psychological evaluation; complying with any treatment recommended by her drug-and-alcohol assessment; submitting to random drug screens, hair-follicle testing, and alcohol swabs; attending and completing a "parenting without violence" class; obtaining and maintaining stable, safe, and appropriate housing; obtaining and maintaining stable employment with an income to support herself and C.J.; obtaining and maintaining a stable form of transportation; visiting regularly and appropriately; and maintaining steady contact with DHS. The goal of the case was reunification.
After a May 14, 2015 review hearing, the circuit court entered an August 27, 2015 review order, finding that Bentley had "somewhat complied" with the case plan, stating that she had completed DHS parenting classes; submitted to a drug-and-alcohol assessment but had not begun the recommended outpatient treatment; tested positive for amphetamine/methamphetamine on May 6, 2015; submitted to a psychological evaluation, but because of her high level of defensiveness and her significantly elevated scores on the "lie scales," it was invalidated and could not be interpreted for diagnosis or recommendation; begun "parenting without violence" classes, but her attendance and participation were not good; and visited C.J. regularly, but the visits were not appropriate. The goal of the case was reunification with the concurrent goal of termination of parental rights and adoption.
In a November 20, 2015 permanency-planning order, the circuit court found that Bentley had maintained housing with her mother, was employed, had obtained her driver's license, relied on family members for transportation, completed additional parenting classes, visited regularly, and was attending outpatient treatment. DHS was ordered to refer Bentley for a second psychological evaluation. The goal remained reunification with a concurrent goal of termination and adoption.
On May 3, 2016, DHS filed a petition for termination of parental rights against Bentley,[1] alleging three grounds: (1) failure to remedy, Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)(a) (Supp. 2017); (2) subsequent factors, section 9-27-341(b)(3)(B)(vii)(a) ; and (3) aggravated circumstances, section 341(b)(3)(B)(ix)(a)(3)(A) , (B)(i). DHS further alleged that termination of parental rights was in C.J.'s best interest.
*289 A fifteen-month-review and permanency-planning order was entered on November 15, 2016, wherein the circuit court found that C.J. had been in DHS custody for twenty-five of her twenty-seven months of life and that Bentley had "checked the boxes" regarding her compliance with the case plan and made significant and measurable progress, although the court specifically noted that it was not making a finding as to whether she had satisfactorily completed services.
Six days of termination hearings were held on November 18, 2016; November 21-22, 2016; December 2, 2016; December 8, 2016; and December 13, 2016. Seventeen witnesses testified. At the conclusion of the hearings, the circuit court orally granted DHS's petition to terminate Bentley's parental rights to C.J. In an order entered on March 1, 2017, the court found that DHS had met its burden of proof by clear and convincing evidence as to all three grounds pled in the termination petition and that termination was in the best interest of C.J. Bentley filed a timely notice of appeal.[2]
Termination-of-parental-rights cases are reviewed de novo. Pine v. Ark. Dep't of Human Servs. , 2010 Ark. App. 781, at 9, 379 S.W.3d 703, 708. Grounds for termination of parental rights must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. Id. , 379 S.W.3d at 708. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. Id. , 379 S.W.3d at 708. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Id. , 379 S.W.3d at 708. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. Id. , 379 S.W.3d at 708. Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. Id. , 379 S.W.3d at 708. As with all issues addressing child placement, the appellate court affords heightened deference to the circuit court's superior position to observe the parties personally and weigh credibility. Dinkins v. Ark. Dep't of Human Servs. , 344 Ark. 207, 215, 40 S.W.3d 286, 292-93 (2001).
In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration the (1) likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Pine , 2010 Ark. App. 781, at 9-10, 379 S.W.3d at 708-09 (citing Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii) (Repl. 2009) ). Additionally, the circuit court must also find by clear and convincing evidence that one or more statutory grounds for termination exists. Id. at 10, 379 S.W.3d at 709 (citing *290 Ark. Code Ann. § 9-27-341(b)(3)(B) ). Proof of only one statutory ground is sufficient to terminate parental rights. Id. , 379 S.W.3d at 709.
In this case, the circuit court found that termination of parental rights was supported by three statutory grounds: failure to remedy, subsequent factors, and aggravated circumstances. On appeal, Bentley challenges all three grounds supporting termination by broadly stating that she "remedied anything and everything that needed remedying resulting in [her] being a safe and fit parent." She also argues that the circuit court's credibility findings were insufficient to support its grounds findings.
This case was opened because C.J. was the victim of severe physical abuse. On September 3, 2014, C.J. (just two months old) was seen by her pediatrician for a well-baby checkup; no concerns or diagnoses concerning C.J.'s health were noted at this visit. The following day, September 4, 2014, Bentley and Jeffrey brought C.J. to the emergency room with complaints that she was choking on milk. Dr. Josh Wilkinson testified that during the evaluation of C.J. at the emergency room extensive retinal hemorrhages and a broken clavicle were found and that he suspected that C.J. had been physically abused. C.J. was hospitalized, and when she began experiencing seizures, she was transported to Arkansas Children's Hospital.
Dr. Farst treated C.J. at Arkansas Children's Hospital and testified that C.J. suffered significant hemorrhaging in the back of her eyes and bleeding on the surface of her brain caused by a recent event of shaken-baby syndrome. Dr. Farst also testified that C.J. suffered orthopedic injuries that included a broken clavicle, two tibia fractures, and one fibula fracture. The clavicle fracture was at least two weeks old, and Dr. Farst confirmed that there was no medical record showing that C.J. had suffered a collar-bone injury at birth or in follow-up visits. Dr. Farst further stated that the tibia and fibula fractures were more recent injuries and could have occurred at the same time as the head injuries. Dr. Farst concluded that these injuries were caused by physical abuse. Dr. Farst further testified that either C.J.'s caregiver had knowledge of how C.J.'s injuries were caused or the caregiver was in a home with other people who caused the injuries, with or without the caregiver's knowledge. In either situation, according to Dr. Farst, returning C.J. to that home would put her at risk for further and potentially more severe injuries.
At the termination hearings, three witnesses testified that Bentley told them that she was feeding C.J. when C.J. started choking and went limp.[3] Bentley subsequently reported that either she or Jeffrey had fallen with C.J. Later, Bentley changed her story again, telling Fort Smith police detective Anthony Rice that she had gone downstairs to smoke, leaving Jeffrey to feed C.J. When she went back upstairs, she found Jeffrey holding C.J., who was not breathing, and Jeffrey said that C.J. had choked on her milk.
Based on these facts, Bentley was either a perpetrator of the physical abuse of C.J., or at a minimum, Jeffrey was the offender, and Bentley failed to protect C.J.[4] Therefore, it was extremely important that Bentley demonstrate to the circuit court that C.J. would be safe if returned to Bentley's custody. To aid in this process, DHS provided Bentley with over two years of services that included referrals to multiple *291 parenting classes, including "parenting without violence" and "nurturing parenting" classes; two drug-and-alcohol assessments; drug testing; drug treatment; two psychological evaluations; and a referral for individual counseling and medication management. The circuit court found that Bentley complied with some of the requirements of the case plan and "checked boxes": she did not have independent housing, but she lived with her mother; she had employment, a driver's license, and transportation; she visited C.J. regularly; she completed two drug-and-alcohol assessments; completed drug treatment; complied with random drug screens; completed parenting classes; and attended two psychological evaluations. The court further found that she "did not meaningfully participate in [services] or benefit from them." Therefore, the circuit court found aggravated circumstances because there was little likelihood that further services to Bentley would result in successful reunification with C.J. We hold that the circuit court did not clearly err in reaching this conclusion based on the following evidence.
Bentley was referred to an eighteen-week "parenting without violence" class. The teacher, Jackie Hamilton, testified that Bentley's attendance was erratic and that it took her thirty-six weeks to complete the course. Hamilton further stated that during the course, Bentley was defiant, resistant, argumentative, and threatened to sue Hamilton for HIPAA violations. According to Hamilton, Bentley did not absorb or internalize the material. Hamilton further testified that Bentley did not identify any deficits of her own, showed no awareness of her involvement in the case, and exhibited credibility issues throughout the classes. Hamilton testified that Bentley never assumed any responsibility for C.J.'s injuries or showed empathy toward C.J.
Because Bentley did not meaningfully benefit from the "parenting without violence" class, the circuit court ordered her to attend the "nurturing parenting" class. DHS had to make three referrals for Bentley-November 2015, February 2016, and October 2016-because she failed to attend the class and the first two referrals expired. Bentley did not begin those classes until October 24, 2016.
DHS caseworker Robbie McKay testified that Bentley attended a drug-and-alcohol assessment, but she lied to the examiner when she reported that she had never used illegal drugs. Bentley admitted at the termination hearing that she lied to the examiner and that she had used methamphetamine. McKay ordered a second drug-and-alcohol assessment, and Bentley was recommended for drug treatment, which she attended. However, McKay testified that Bentley did not rehabilitate herself with regard to her substance-abuse issue. Bentley, who had told McKay that she was addicted to hydrocodone, testified at the hearing that she took hydrocodone several times during the case and did not provide proof that she had a prescription for these narcotics. Bentley further testified that she started using methamphetamine four to five times a week after C.J. was taken from her custody. She tested positive for methamphetamine on May 6, 2015. Bentley also tested positive for alcohol during the case.
McKay also testified that the results of Bentley's first psychological evaluation were invalidated because she was dishonest during testing. Bentley submitted to a second psychological evaluation and was diagnosed with adjustment disorder with anxious mood, unspecified depressive disorder, and personality disorder. It was recommended that Bentley seek, among other things, psychiatric consultation regarding the need for psychopharmacological intervention.
*292 Bentley was referred for this consult, yet she failed to attend, testifying that she did not go because she was pregnant and did not think that she could take medicine. McKay testified that Bentley never said that she was pregnant and could not attend the referral, and McKay said that after Bentley had her baby,[5] she never said that she was ready for the referral. McKay testified that Bentley had not rehabilitated herself with regard to her psychological issues. The circuit court agreed, finding that Bentley's failure to attend the referral for psychopharmacological management was "one of the most serious issues that the mother failed to address in this case."
Evidence showed that after more than two years of services, Bentley's visits with C.J. were not "appropriate." McKay testified that she observed Bentley and C.J. interact at least fifty times and observed entire visitations ten to fifteen times. According to McKay, Bentley aggravated and irritated C.J.; Bentley would put C.J. in timeout when C.J. was less than one year old; when C.J. was upset, Bentley would laugh at C.J.; and Bentley would slap C.J. on the hand for discipline. When McKay asked what Bentley had learned in one of her parenting classes, Bentley's only response was that she learned that it is okay to spank your child in Oklahoma.[6] This was very concerning to McKay because C.J. came into DHS care due to physical abuse, and McKay was not convinced that Bentley did not play a part in harming C.J. McKay further testified that Bentley and C.J. do not have a close bond. McKay said that Bentley showed inappropriate parenting skills during supervised visitation and that she (McKay) had concerns that, if C.J. was returned to Bentley without supervision, C.J. would be at risk of further physical abuse and emotional damage.
McKay also testified that she had issues with Bentley's lack of credibility throughout the case. McKay said that Bentley lied to the drug-and-alcohol-assessment examiner and psychological examiner. Bentley often lied to McKay. Based on Bentley's behavior, McKay stated that-based on her twenty-two years of caseworker experience-she could not think of any additional services that DHS could offer to Bentley that would likely result in reunifying with C.J. within a reasonable period of time.
Donna Morgan, a child therapist, testified that she observed "very minimal" interaction between C.J. and Bentley during visits and that she "did not see much of a bond between C.J. and her mother." Morgan doubted Bentley had the ability to parent so that C.J. could develop appropriately. Morgan opined that continued visits between C.J. and Bentley could be detrimental to C.J. because trying to recover a connection where a child is not trusting of a parent can cause more harm to the child.
Other evidence showed that Bentley did not comprehend or even acknowledge the physical abuse Jeffrey caused to C.J. Bentley regularly visited Jeffrey while he was in jail for abusing C.J. She admitted that when Jeffrey was in jail she talked with him regularly.[7] Bentley admitted at the hearing that she lied to DHS workers when she told them that she was not communicating with Jeffrey when he was in jail. Bentley further testified that she loved Jeffrey and did not believe that he was responsible for C.J.'s injuries until *293 March 2016, when he was sentenced for the abuse.
The circuit court's significant concern over Bentley's complete lack of credibility provides additional support for its finding that there was little likelihood that further services to Bentley would result in successful reunification with C.J. In this case, the circuit court devoted three pages of its termination order to Bentley's many lies and inconsistent behavior. The circuit court concluded its order by finding that Bentley "lacks all credibility" and that "[i]n all of the court's prior legal experience, the court has never seen such dishonesty from a witness ... [t]he court could not trust one statement made by the mother." A few examples of Bentley's dishonesty are discussed above. Bentley admitted at the hearing that she lied to DHS, to the doctors, and to the providers of her services.
Taken together, there is overwhelming evidence in this case to support the circuit court's aggravated-circumstances finding. Bentley's argument that the circuit court clearly erred on this point because the evidence shows that she complied with the case plan and court orders is not well taken. Even when an appellant may have completed some parts of the case plan, compliance with a case plan does not justify reversing a termination case if the appellant continued to make decisions adverse to the child. Chase v. Ark. Dep't of Human Servs. , 86 Ark. App. 237, 241, 184 S.W.3d 453, 455 (2004). What matters is whether Bentley's completion of portions of the case plan achieved the intended result of making her capable of caring for C.J. Wright v. Ark. Dep't of Human Servs. , 83 Ark. App. 1, 7, 115 S.W.3d 332, 335 (2003). The evidence as set forth above establishes that despite over two years of extensive DHS services, Bentley did not benefit from the services or gain sufficient parenting skills to regain custody of C.J.
Moreover, Bentley's argument is essentially asking this court to reweigh the evidence in her favor and to reach a result contrary to that of the circuit court. But under the standard of review, we do not act as a super fact-finder, and it is not reversible error for the circuit court to weigh the evidence differently than how Bentley asks the evidence to be weighed. Allen v. Ark. Dep't of Human Servs. , 2018 Ark. App. 136, at 20, 540 S.W.3d 742, 754. The credibility of any witness's testimony is to be assessed by the trier of fact-and the trier of fact may believe all, part, or none of it. Brumley v. Ark. Dep't of Human Servs. , 2015 Ark. App. 90, at 12, 455 S.W.3d 347, 355. Here, the circuit court did not believe any of Bentley's testimony.
In this case, Bentley needed to show improvement in her parenting skills and was given over two years to do so, but she failed. Accordingly, we hold that the circuit court did not clearly err in finding that there was little likelihood that further services would result in Bentley successfully reunifying with C.J. Therefore, we affirm the circuit court's aggravated-circumstances finding.[8]
Bentley next argues that termination of her parental rights to C.J. was not in C.J.'s best interest. In determining whether termination is in the best interest of the juvenile, the circuit court must consider the likelihood that the juvenile will be adopted and the potential harm that would be caused by returning the juvenile *294 to the custody of the parent. Chaffin v. Ark. Dep't of Human Servs. , 2015 Ark. App. 522, at 5, 471 S.W.3d 251, 255. Adoptability and potential harm, however, are merely two factors to be considered and need not be established by clear and convincing evidence. Id. , 471 S.W.3d at 255. The evidence presented on potential harm must also be viewed in a forward-looking manner and considered in broad terms, but a circuit court is not required to find that actual harm will result or to affirmatively identify a potential harm. Id. , 471 S.W.3d at 255.
Bentley does not challenge the circuit court's adoptability finding.[9] She does, however, challenge the potential-harm finding. She contends that the circuit court clearly erred on this point because she had custody of C.T., a child born after C.J.'s removal, and C.T. was not harmed in her custody. For support, she cites the testimony of several witnesses. Ashley Shockley, an Oklahoma family-counseling therapist, testified that Bentley acted appropriately with C.T. during their sessions that began in June 2016. Shane Thompson, a DHS employee in Oklahoma, testified that his investigation of Bentley for alleged substance abuse and causing harm to C.T. were unsubstantiated and that he had no concerns about Bentley's parenting of C.T. And Donald Basham, an Oklahoma DHS employee, testified that at the request of Arkansas DHS, he performed a home study at Bentley's mother's home in October 2015, he found the home in order, and he approved the home study.[10]
We reject Bentley's argument that because there was evidence that she provided a safe home for C.T. the circuit court clearly erred in finding that C.J. would be subjected to potential harm if returned to Bentley's home. Bentley is again asking that we reweigh the evidence-giving less to the best-interest evidence relating to C.J. and giving more to the evidence concerning C.T. Arguments asking that we reweigh the evidence are not reversible-error arguments. Allen , 2018 Ark. App. 136, at 20, 540 S.W.3d at 754. This court cannot act as a super fact-finder or second-guess the circuit court's credibility determination. Dunbar v. Ark. Dep't of Human Servs. , 2016 Ark. App. 472, at 12, 503 S.W.3d 821, 828-29.
In this case, the circuit court had ample evidence of potential harm to support its best-interest finding. As set forth above, this case began after it was discovered that C.J. was a victim of significant physical abuse. Evidence was presented that either Bentley played a role in C.J.'s injuries or, at the very least, failed to protect C.J. from the abuse. After more than two years of receiving DHS services, Bentley failed to demonstrate that she understood C.J.'s injuries and needs as there was significant evidence that her parenting and discipline skills were lacking. There was evidence that there was no bond between Bentley and C.J. Bentley continued to associate with Jeffrey, C.J.'s abuser, for the first half of the case and only admitted that Jeffrey abused C.J. once Jeffrey was sentenced. Bentley, who was evaluated with antisocial personality disorder with paranoid and borderline aspects, refused to attend the referral for counseling and pharmacological management.
*295 Finally, Bentley's utter lack of honesty throughout the case, with every person she encountered, caused the circuit court to find that Bentley "lacks all credibility." The court stated that it had "never seen such dishonesty from a witness" and "could not trust one statement made by the mother." Based on this credibility finding, the circuit court further found that
[a]ll of these inconsistencies and lies are a concern to the court because a child who has had significant trauma and a mother who cannot be honest with even the simple facts cannot be trusted to protect this child. The mother's lack of truthfulness is of great concern to the court and the court specifically finds that there is a grave risk of physical harm if the child were to be returned to the mother.
After considering and weighing the evidence from the entire history of the case and from six days of termination hearings, the circuit court concluded that Bentley's overall progress did not demonstrate sufficient stability to ensure that C.J. would not be at continued risk of potential harm if returned to Bentley's custody. We are not left with a definite and firm conviction that a mistake has been made. Therefore, we hold that the circuit court did not clearly err in finding that termination was in C.J.'s best interest.
Affirmed.
Klappenbach and Murphy, JJ., agree.

The petition did not name Jeffrey as a defendant. Bentley was not married at the time of C.J.'s birth, and Jeffrey was determined by genetic testing not to be C.J.'s father.

This is the second attempt to appeal this case. In the first attempt, Bentley's counsel filed a motion to be relieved as counsel and a no-merit brief; however, we denied counsel's motion to be relieved and ordered rebriefing based on briefing deficiencies. Bentley v. Ark. Dep't of Human Servs. , 2018 Ark. App. 125, 2018 WL 847225. In this second attempt, counsel has filed a merit brief.

These three witnesses were a Fort Smith police detective, C.J.'s nurse at the emergency room, and an Oklahoma DHS investigator.

Jeffrey was later arrested for, confessed to, and was convicted of second-degree battery of C.J.

Bentley's second child, C.T., was born in July 2017.

Bentley resides in Oklahoma.

Detective Rice testified that there were taped recordings of Bentley's numerous jail-house telephone conversations with Jeffrey.

Because only one statutory ground is required to be proved, we need not discuss the alternative statutory grounds relied on by the circuit court in terminating Bentley's parental rights. Shaffer v. Ark. Dep't of Human Servs. , 2016 Ark. App. 208, at 6, 489 S.W.3d 182, 185-86.

McKay testified that C.J., despite her special needs, was adoptable. Moreover, McKay stated that C.J.'s foster family, who had had custody of C.J. throughout the case, was interested in adopting her.

Thompson said a second home study was requested by Arkansas DHS in September 2016; however, he was unable to perform that home study due to the investigation into Bentley's alleged abuse of C.T.