Cite as 2022 Ark. App. 146

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-21-433

| | |
|---|---|
| KRISTEN GIBBY | Opinion Delivered March 30, 2022 |
| APPELLANT | |
| | APPEAL FROM THE CONWAY COUNTY CIRCUIT COURT |
| V. | [NO. 15JV-20-59] |
| | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE TERRY SULLIVAN, JUDGE |
| APPELLEES | AFFIRMED |

**KENNETH S. HIXSON, Judge**

Appellant Kristen Gibby appeals after the Conway County Circuit Court filed an order terminating her parental rights to her children, TP (DOB 10-24-19) and TF (DOB 01-14-18). Appellant argues on appeal that (1) there was insufficient evidence to support the statutory grounds for termination and (2) there was insufficient evidence that termination was in the best interest of her children.[1] We affirm.

I. *Relevant Facts*

On April 14, 2020, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect of TP and TF. In the affidavit

---

[1]This case is the companion to *Gibby v. Arkansas Department of Human Services*, 2022 Ark. App. 145, also decided today, in which appellant has appealed the termination of her parental rights to another child, IG (DOB 09-09-20).

attached to the petition, DHS stated that a seventy-two-hour hold was exercised over TP and TF on April 11, 2020, because the "[c]aretaker caused serious physical injury to the child or made a plausible threat to cause severe physical injury." A family-service worker (FSW) had averred that DHS received a report that then five-month-old TP had been admitted into the pediatric intensive care unit at Arkansas Children's Hospital with a "subdural Hematoma, petechia and bruise on her leg's chest, and tongue." The hospital staff reported to the FSW that appellant appeared not to be concerned about TP's brain injury, and Dr. Clingenpeel opined that TP's injuries were consistent with physical abuse. During an interview, appellant told the FSW that the injury occurred when she was giving her other child, TF, a bath. When she had finished, appellant claimed that her husband, Payton Lane Gibby,[2] was holding TP in his arms and that he told her TP was choking. Appellant said that TP "was pale for three seconds, went limp and then started turning purple."

Mr. Gibby's story was inconsistent. He could not remember the chain of events that happened earlier on the day of the injury or even whether he had been taking care of TP. Later, he stated that it was appellant who had "tucked the baby in on the couch before she left" that morning. He also reported that he had put TP in her highchair while appellant gave TF a bath, and when he came back, he noticed she was choking. Due to the inconsistent

---

[2]Mr. Gibby is neither TF's nor TP's father; however, Mr. Gibby is IG's father. Although putative fathers were initially identified for TF and TP and were ordered to submit to DNA testing, the circuit court subsequently found that "no putative father rights have attached to any person" after the testing results showed those individuals were not either child's father.

stories and allegations of physical abuse, DHS exercised a seventy-two-hour hold to ensure both children's safety.

The circuit court granted the petition, finding that probable cause existed for the removal, and a probable-cause order was filed on May 13, 2020. An agreed adjudication order was subsequently filed on June 16, 2020, finding the children dependent-neglected because "the history given about the injuries sustained by [TP] is at variance with medical opinion of Dr. Clingenpeel." The order further made the following findings:

> The first contact of the Arkansas Department of Human Services arose during an emergency where immediate action was necessary to protect the health, safety and welfare of the juveniles and where preventative services could not be provided, specifically, on 4/11/20, [TP] was admitted to the Arkansas Children's Hospital PICU with bilateral subdural hemorrhage, extensive bilateral multilayer retinal hemorrhages through the periphery and bruising to multiple body surfaces. Kristen [Gibby] indicated that she was bathing [TF]. Kristen then located her husband, Payton Gibby, holding [TP]. [TP] was limp, pale and her eyes were closed. Mr. Gibby indicated [TP] had choked on her formula. Dr. A. Clingenpeel, MD treated [TP] at Arkansas Children's Hospital. *Dr. Clingenpeel provided that in her medical opinion, the history given by Kristen [Gibby] is at variance with the injuries presented.*

(Emphasis added.) The goal of the case was set as reunification with a fit parent. Appellant was ordered to cooperate with DHS, comply with the case plan, and obey all orders of the circuit court; view "The Clock is Ticking" video; remain drug-free and submit to random drug screens; participate in and complete parenting classes; obtain and maintain clean, safe, and stable housing and employment; resolve all criminal issues; and allow DHS access to the home. Further, if requested by DHS, appellant was ordered to submit to a drug-and-alcohol assessment and follow any recommendations; submit to a psychological evaluation and

follow any recommendations; and attend and participate in counseling and/or AA/NA meetings.

The circuit court held its first review hearing on September 3, 2020, and an order was filed on November 13, 2020. In its order, the circuit court noted that appellant was in compliance with the case plan and was attending counseling. However, the circuit court found Dr. Clingenpeel's testimony to be "highly credible" as to TP's injuries and that the injuries "are indicative of abuse, child abuse, and blunt force trauma." Therefore, the circuit court found that TP "was abused and that the previous testimony of Kristen [Gibby] and Payton Lane Gibby before the Court as to how the child's injuries were received is not credible."

A second review hearing took place on February 25, 2021. Regarding compliance with the case plan, the circuit court found that appellant had

> housing, income, transportation, and has complied with counseling and other services. However, horrendous injury to a child occurred while the juvenile was in the care of the mother and father only, as testified to by the mother and father. Payton Lane Gibby, the mother's significant other, is incarcerated at this time for charges relating to the battery of the child. The mother and Mr. Gibby have given a number of explanations for what may have happened, but none of those explanations are plausible. . . . The Court specifically finds the testimony of Brandy Cochran is credible. The Court finds neither of the parents' testimony was credible.

At this hearing, the circuit court changed the goal to adoption following termination of parental rights.

DHS filed a petition for the termination of parental rights on March 2, 2021, specifically alleging that appellant's parental rights should be terminated under the following

4

grounds pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(vi)(*a*), (vii)(*a*), and (ix)(*a*)(2)–(3) (Supp. 2021): a finding by the court that the juvenile or a sibling was dependent-neglected due to abuse that could endanger the life of the child and was perpetrated by the juvenile's parent, parents, or step-parent; subsequent factors; that the parent had committed or aided in a felony battery that resulted in serious bodily injury to any juvenile; and aggravated circumstances, specifically that there is little likelihood that services to the family would result in successful reunification and that a child or sibling has been neglected or abused to the extent that the abuse could endanger the life of the child. A termination hearing was held on April 8, 2021.[3]

At the termination hearing, the court first addressed IG's paternal grandmother's motion to intervene. Because all parties had not been properly served or had time to reply, the court dismissed the motion without prejudice and continued with the hearing.

Amy Thurman, an advanced practice registered nurse at a clinic in Morrilton, testified that prior to the event on April 14, 2020, which precipitated the admission at Arkansas Children's Hospital, she saw TP on February 25, 2020, when Mr. Gibby brought her into the clinic as a new patient. She saw TP again on April 8, 2020, when she was brought in by appellant due to a rash on TP's neck. Ms. Thurman was not aware of anyone else in the

---

[3]TF and TP's younger sibling, IG, was also removed from appellant's custody after his birth due to the substantial risk of serious  harm as a result of TP's abuse. IG's dependency-neglect case was filed separately, and DHS also filed a petition to terminate appellant's parental rights as to IG. The circuit court heard evidence as to both termination petitions in a joint termination hearing.

clinic seeing TP other than a nurse who handled check-ins. At both visits, TP was "awake, alert, well developed, well-nourished, pleasant, active." Ms. Thurman explained that she diagnosed the rash as a "yeast rash." She stated that there were no reports of TP having any problems eating, a black spot on her tongue, or eye issues.

Ashley Coffman, a relative of Mr. Gibby, testified that although appellant and Mr. Gibby would fight and appellant would get "frustrated" with the children, she had "never seen [appellant] physically or even verbally say something mean towards [her children]." However, Ashley testified that on March 21, 2020, about three weeks prior to the incident, appellant told her that she, the appellant, did not "have a connection" with TP and asked Ashley if she wanted to adopt TP. Ashley further testified that appellant had asked her about also adopting IG when he was born because appellant "didn't want him." Ashley testified that she had seen appellant "get aggressive" on more than one occasion. She described an incident at TP's birthday party in which appellant became mad, raised her voice, and started cussing at the adults.

Mr. Gibby's mother, Genia Coffman, testified that she has known appellant since appellant and Mr. Gibby married in November 2019. She testified that she could tell that appellant wanted TF, but not TP. She claimed that appellant had cussed at TP and would throw her down on the couch. She also stated that appellant and Mr. Gibby would fight and that appellant has a temper. Ms. Coffman testified that appellant, Mr. Gibby, and both children had been at her house earlier on the night of TP's injury. She stated that at one point, appellant took TP with her to the bathroom to give TP a bath. Ms. Coffman testified

6

that she heard TP screaming and crying. When appellant came out with TP, Ms. Coffman gave TP a bottle. Shortly thereafter, appellant, Mr. Gibby, TF, and TP left. Ms. Coffman testified that later that evening appellant came back to her home, stating that TP had stopped breathing. Ms. Coffman explained that she went to appellant's home to help and tried to resuscitate TP. Both Mr. Gibby and appellant called 911. Ms. Coffman stated that appellant was walking around most of the time and texting on her phone when Ms. Coffman was trying to resuscitate TP. Ms. Coffman testified that after the injury, appellant's family had threatened to kill Mr. Gibby and burn his house if Mr. Gibby did not say that he was the one who hurt TP.

Betty Hill, Mr. Gibby's grandmother, testified that appellant would yell and curse at TP. Ms. Hill explained that appellant would be rough with TP and throw her on the couch. She also stated that she had seen appellant act violently toward Mr. Gibby. Ms. Hill testified that Mr. Gibby had told her that he was going to lie and say that he hurt TP because appellant had convinced him that she could get the children back if he did so.

Payton Lane Gibby, IG's father and TF and TP's stepfather, testified that he was currently married to appellant. He testified that on the night of TP's injury, the family had been at his mother's home and that appellant had taken TP to the bedroom or bathroom alone. He noticed that TP had a "blank stare" after they left his mother's home, and he changed her diaper once the family had returned home. He went on to say that he had subsequently confessed to a battery charge only because appellant and her family had threatened him. He denied that he ever did anything to hurt TP that night. Although he

7

stated that appellant had never admitted to him that she hurt TP, he believed that it was appellant who injured TP. Mr. Gibby also testified that he had seen appellant "toss [TP] down on the couch," which he did not think was safe for her to do. He further testified that appellant had told him that she did not have a connection with TP and that she had asked Ashley Coffman to adopt TP. Mr. Gibby testified that appellant had been using drugs during the pendency of the case.

On cross-examination, Mr. Gibby admitted that he was currently in jail on charges of first-degree battery of TP after he made a confession at a prior hearing in the dependency-neglect case.[4] Concerning the night of the incident, Mr. Gibby explained that appellant had gone to give TF a bath while he changed TP's diaper. He stated that he had first been in the living room but then went into the bedroom with TP to change TP's diaper for a second time before calling out to appellant that something was wrong. Mr. Gibby further stated that he thought it was appellant who had hurt TP. He admitted that he did not tell anyone because he was being threatened. Mr. Gibby also admitted that he had stayed by appellant's side and in their marriage throughout the case and that he was not the one who had filed for divorce.

Appellant testified that she is the mother of TF, TP, and IG. She admitted that she is still married to Mr. Gibby, but she stated that she had filed for divorce the previous fall. Appellant testified that on the night TP was injured, she and Mr. Gibby had helped TF and

---

[4]The confession is not in the record; however, the lack of the confession does not affect the disposition of the case.

the other children dye Easter eggs at Ms. Coffman's home while Ms. Coffman watched TP in the living room. She denied ever taking TP into the bathroom to bathe her. Appellant instead claimed that after she and her family returned home that night, she went to give TF a bath and had not heard anything until Mr. Gibby called her name. She got TF out of the tub and went into the bedroom where she saw TP limp in Mr. Gibby's arms. Appellant stated that she then went next door to Ms. Coffman's home and asked for her assistance because she thought her mother-in-law knew how to do CPR. Appellant claimed that she called 911 within five minutes of her mother-in-law's coming to the house, and while the paramedics were performing CPR, she had gotten a bag together to take to the hospital. It was her opinion that neither Mr. Gibby nor Ms. Coffman showed any emotion the night of the incident.

Appellant testified that she had told the truth when she had been interviewed after the incident. However, when she was confronted with inconsistent statements she made to law enforcement, she cursed, stating that she could not be expected to remember every detail after a traumatic event. When confronted with even more inconsistent statements that she had made to various people regarding the chain of events, appellant stated, "Y'all are also questioning me a year after it happened and I've also been in two wrecks in the past two weeks . . . I've been in the hospital from head injury. . . . who's going to remember everything." However, when asked how she could explain why her stories were inconsistent even just days after TP's injury, appellant responded, "I don't know. I know I didn't do it. But y'all are out to get me, so it doesn't matter what I say."

9

Appellant was questioned about prior medical visits that had taken place before the incident in April 2020. Apparently, she had testified at prior hearings that she had taken TP to medical appointments for a black spot on TP's tongue and for eye problems. However, in light of Ms. Thurman's testimony, she stated that it must have "slip[ped] my mind." When pressed about whether she ever took TP to the emergency room as she had previously stated, she initially testified that she could not remember and later just said that she had "thought" she had.

Appellant admitted that she had gotten into a verbal argument with Mr. Gibby at a birthday party prior to TP's injury as other witnesses had testified, but she disputed that she had ever hit Mr. Gibby. Instead, she asserted that it was Mr. Gibby's grandmother who had been physically aggressive that day. She also disputed the testimony of Mr. Gibby's family, stating that they had not been in favor of their relationship from the beginning.

Appellant admitted having a prior drug addiction, but she stated that the last time she had "relapsed for a week" and used drugs was when TF was six months old. She denied being frustrated with TP, hurting TP, or asking Mr. Gibby to lie on her behalf. Appellant admitted that she had given TP a bath the morning of the incident, but she again denied that she had given TP a bath when at her Ms. Coffman's house. She also stated that she did not use the bathroom to give TP a bath but would use a portable bathtub and place it on the living-room floor on top of a towel.

Appellant denied ever throwing TP on the couch or asking Ashley Coffman to adopt any of her children. She claimed that she was bonded to her children. When asked whether

10

she or her family had threatened Mr. Gibby or whether she had promised to "get back together," she stated, "I personally never threatened him. I have no idea what my family has told him. But, I mean, I have no intention of getting back with him."

Brandy Cochran, the DHS supervisor for both of appellant's dependency-neglect cases, testified that DHS was recommending that parental rights be terminated. She explained that the reason for this recommendation was "[d]ue to the severity of the injuries to [TP] and the inconsistencies of the story and not knowing what happened to the child. We cannot ever safely recommend that the children return back to that home with that mother." She went on to explain that TP had suffered a subtraumatic subdural hemorrhage; acute respiratory failure; a fractured rib; retinal hemorrhage; abrasions on her ear; and contusions on her thorax, left lower leg, right lower leg, and right forearm. All of appellant's explanations had been "run by Dr. Clingenpeel"; however, Dr. Clingenpeel indicated that none of the proposed explanations were plausible or could have caused the injuries sustained by TP. Ms. Cochran testified that, despite appellant's completing the services she had been offered, her completion did not ensure the health and safety of the children. Ms. Cochran opined that because there was no plausible explanation offered, and there were only two people who were present at the time who could have caused the injuries, either appellant abused TP and caused TP's injuries or appellant failed to protect TP. Ms. Cochran explained that, regardless of the answer, she did not think any of the children were safe in appellant's care.

Ms. Cochran testified that TP was still recovering from her injuries. TP was relearning how to see, and there was a possibility that TP may need surgery if she did not recover by June of that year. Ms. Cochran testified that she found Mr. Gibby to have been untruthful, but she had never found him to be violent, and he had never lost his temper with her. Regarding appellant, Ms. Cochran testified that she found appellant to be untruthful and that she has anger issues. She had seen appellant "lose control" and even lose control and curse during the termination hearing. Ms. Cochran testified that because appellant refused to provide a reasonable explanation for TP's injuries, there were not any services that could be offered to increase the likelihood of reunifying the family. She testified that all three children are adoptable because they are "healthy children, they're lovable children, they're very sweet." Thus, in her opinion, the risk of harm outweighed any potential issues concerning adoptability.

On cross-examination, Ms. Cochran stated that DHS had drug tested appellant five or six times throughout the case and that appellant had submitted to a hair-follicle test. All the drug screens and the hair-follicle test had come back negative for any substance. Ms. Cochran also testified that DHS had arranged a psychological evaluation for appellant and did not believe that it indicated any untreated mental-health issues.

DHS rested its case, and appellant moved for directed verdict, which was denied by the circuit court.

Deborah Phillips, appellant's mother, testified that she attended the birthday party at which, pursuant to the testimony of Mr. Gibby's family, appellant was yelling and cursing.

12

Ms. Phillips admitted that appellant did yell and curse, but she said that it was not directed at everyone. Ms. Phillips explained that she saw Mr. Gibby's grandmother, Betty Hill, yell at appellant and that Ms. Hill pushed both her and appellant down a hall. According to Ms. Phillips, appellant was on the phone with her the night TP was injured while appellant was giving TF a bath. Ms. Phillips testified that appellant got off the phone with her when Mr. Gibby yelled for appellant. Ms. Phillips testified that she had seen Mr. Gibby get angry and act as if he was about to grab appellant but stop when he saw that she was watching. She had never seen appellant yell or hit any of her children, and she did not think appellant was capable of injuring TP. However, when asked if appellant has anger issues, she responded, "Everybody has anger issues[.]"

Jordan Brown, the secondary caseworker assigned to the case, testified that appellant had completed all required services and had been compliant with DHS. Ms. Brown had observed two separate visitations and felt that both had gone well and that appellant was loving and affectionate to her children. She also testified that appellant has an appropriate home with rooms set up for her children. Ms. Brown opined that appellant deserved extra time and that her rights should not be terminated. Ms. Brown admitted, however, that she had not talked to Mr. Gibby or any of his family members and that she had not read any of TP's medical records. Instead, her only source of any information had been appellant. Appellant had denied that she was a part of TP's abuse and stated that Mr. Gibby was the abuser. Further, Ms. Brown admitted that she had only recently been assigned the case and had interacted only with appellant. Finally, she admitted that the primary caseworker was

13

in a better position and was privy to more information to make a recommendation on behalf of DHS.

Finally, the attorney at litem called the CASA volunteer, Sarah Murphy, to testify. Ms. Murphy testified that her recommendation had changed and that she now recommended termination of parental rights after looking through the medical records.

At the conclusion of the termination hearing, the circuit court orally ruled from the bench that it was granting DHS's petitions for termination of parental rights filed in both cases. The circuit court filed a written order terminating appellant's parental rights on June 9, 2021. Regarding TF and TP, the circuit court specifically found by clear and convincing evidence that all the grounds alleged in the petition supported termination and that it is in the best interest of the children to terminate appellant's parental rights. In relevant part to appellant's points on appeal, the circuit court made the following specific findings:

> 4. The Court has considered and reviewed all the evidence submitted and the testimony of the witnesses in this matter, and finds that the Department of Human Services has proven by clear and convincing evidence that:
>
> > a. The court has found the juvenile or a sibling dependent-neglected as a result of neglect or abuse that could endanger the life of the child, sexual abuse, or sexual exploitation, any of which was perpetrated by the juvenile's parent or parents or step-parent or step-parents. The juveniles were removed from the home of the mother on April 11, 2020, a 72 hour hold having been taken due to extreme injury to [TP], at that time a five (5) month old baby, including sub traumatic subdural hemorrhage, acute respiratory failure, fractured rib, retinal hemorrhaging, abrasions on her ear, contusions on her thorax, left lower leg, right lower leg, and right forearm. The Court adjudicated the juveniles dependent neglected based upon the history given about the injuries sustained by [TP] were at variance with the medical opinion of Dr. Clingenpeel. The parents told different stories as to what caused the injuries to the juvenile, none of

14

which were capable of causing such serious and devastating injuries. On September 3, 2020, a Review hearing was held at which Dr. Clingenpeel testified regarding the natural and seriousness of the injuries. The Court found that the testimony of Dr. Clingenpeel was highly credible as to the injuries sustained by the juvenile, [TP], specifically that they were indicative of child abuse and blunt force trauma. The Court finds that Dr. Clingenpeel is one of the foremost experts in the state of Arkansas for traumatic injuries to children, and she likened the force required to cause the injuries to the juvenile to the force exerted in a car crash. The Court found that the child was abused and that the previous testimony of Kristen [Gibby] and Peyton Lane Gibby before the Court as to how that child's injuries were received, is not credible. To rehabilitate the family, the Court ordered and the Department provided various services, including counseling, a psychological evaluation, parenting classes, and visitation. Although the mother has complied with the above services, and has housing and employment, the mother has not benefitted from these services. The mother has had a just a few days shy of a full year at this time, yet neither she, nor her husband have given any kind of reasonable or rational explanation for what caused the juvenile's injuries. The mother is attending counseling, however, she is not being honest and truthful with the Department, or her counselor, and she cannot benefit from services, such as counseling. The mother's testimony at the hearing in February of 2021, failed to provide any kind of explanation that was consistent with the juvenile's serious injuries. At that hearing, the testimony of the mother's husband was that she had been hiding a drug problem from the Department, and had admitted to him serious drug use in the last few months. The reason the juveniles were removed was serious physical injury to the baby which the mother could not explain. The mother will still not provide any plausible explanation, and is still not being truthful to the Department or this Court regarding the injuries to the child. Her circumstances cannot be rehabilitated, and the juveniles cannot be safe as the mother will not tell the truth of the injury. She either abused and caused the injury to the juvenile, or she failed to protect the juvenile from devastating injury. Either way, the juveniles are not safe in her home. The juveniles were found dependent neglected due to significant injuries to the juvenile [TP] that was at variance with the history given by the parents. From the parents' own testimony, they were the only ones who were with [TP] when she was injured, therefore either [TP]'s mother, or her step-father, Payton Gibby, abused her to such an extent that it could and did endanger her life. The baby almost died on the night of April 11, 2020, and almost a year later, she is still recovering from those

15

injuries. The testimony from the witnesses is replete with the mother's anger issues, and her feelings towards the juvenile. The Court specifically finds the testimony of Ashley Coffman, Betty Hill and Gena Coffman credible. The testified to how the mother treated the juvenile, having seen the mother throw the juvenile, and curse the juvenile. She threatened to have a sibling to these juveniles ripped out of her womb, and asked other people to adopt him. The mother herself showed her inability to control her anger on the stand today. The mother was inappropriate on the witness stand, cursing and having an angry outburst. Despite the services given to the mother, she has not resolved her anger issues, and is still a risk to any juvenile who is around her. Further the Court finds Peyton Gibby's testimony credible regarding the mother's admission of recent drug use.

b. That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent. The juveniles were removed due to the serious physical abuse of the juvenile [TP]. Since that time, the mother and her husband have continued to come up with explanations for the injuries that were not possible. Further, Payton Gibby testified that the mother admitted to him she was using illegal substances, and showed him her track marks. The mother has failed to disclose the real reason behind the juvenile's injury, and has instead used illegal substances, without telling the Department, or attempting any type of rehabilitation. This shows an indifference at the very least to remedy the subsequent factors. The Court has found that the Department has provided reasonable efforts to provide services to correct the mother's issues, however the mother cannot or will not be honest with the Department about the cause of the juvenile's injuries or her substance abuse issues. The attempt to rehabilitate the mother's anger and drug issues has been of no use, due in part to the mother's inability to be honest.

c. The parent is found by a court of competent jurisdiction, including the juvenile division of circuit court, to:

16

i. Have committed a felony battery that results in serious bodily injury to any juvenile or to have aided or abetted, attempted, conspired, or solicited to commit felony battery that results in serious bodily injury to any juvenile; This Court finds that the mother has either committed a felony battery, ore conspired in her husband's committing a felony battery, that resulted in serious bodily injury to [TP], her child. The juvenile suffered from hemorrhaging in her brain and eyes, broken bones, and contusions, which are serious injuries. The Court finds Payton Gibby's testimony today to be credible.

ii. *(A)* Have subjected any juvenile to aggravated circumstances. *(B)* "Aggravated circumstances" means:

1. *(i)* A juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification; The juvenile [TP] was subjected to extreme cruelty. Dr. Clingenpeel testified that the injury had to be caused by extreme force, and likened it to a high impact car accident. Whatever mechanisms cause these injuries, including crushing the child, squeezing the child, battering the child, hitting the child, throwing the child, or shaking the child were extremely cruel. Further due to the serious nature of the injuries, and the mother's continued refusal to account for them, there will be little likelihood that nay further services could successfully reunify this family.

2. *(iii)* A child or sibling has been neglected or abused to the extent that the abuse or neglect could endanger the life of the child. The juvenile [TP] was subjected to physical abuse that endangered her life. She had several serious and severe injuries, to her brain, body, and bones. These injuries, particularly her brain injuries, could have easily taken this child's life. Further the mother continues to show unchecked anger problems. The testimony today was replete with the violence of the mother, including threats that she has made to harm the juveniles or

17

Mr. Gibby. This Court finds it is NOT safe to put any child with this mother.

5. The Court finds by clear and convincing evidence that it is in the best interest of the juveniles to terminate parental rights. In making this finding, the court specifically considered (A) the likelihood that the juvenile will be adopted if the termination petition is granted, specifically the testimony of Brandy Cochran who stated due to the personalities, physical characteristics, health and placement of the juveniles the likelihood of the juveniles being adopted is high, and the Court finds based upon these factors that the juveniles are adoptable; (B) the potential harm on the health and safety of the juvenile caused by returning the juvenile to the custody of the parent(s). The Court finds the testimony of the evidence today, even from the mother's own behavior show how these, or any juveniles placed with the mother, would be at risk of potential harm if returned to the mother due to her anger issues, and shown by her cruelty to the juvenile. Further, the Court finds that Payton Gibby failed to protect the vulnerable juveniles from Kristen Gibby and her violence, and has not shown that he will.

6. As such, the Court grants the Petition of the Department of Human Services and hereby terminates all parental rights between Kristen [Gibby] and her children. Any prior orders directing the parent(s) to pay on-going child support on behalf of the juvenile shall cease upon entry of this order.

This appeal followed.[5]

## II. *Standard of Review*

A circuit court's order terminating parental rights must be based upon findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing evidence is defined as that degree of proof that will produce in the fact finder a firm conviction as to the allegation sought to be established. *Posey v. Ark. Dep't of Health & Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). On appeal, the appellate court reviews

---

[5]Although appellant's notice of appeal was untimely filed, we granted her motion for belated appeal on September 29, 2021.

18

termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*

In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing by clear and convincing evidence of one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). However, only one ground must be proved to support termination. *Reid v. Ark. Dep't of Hum. Servs.*, 2011 Ark. 187, 380 S.W.3d 918.

The intent behind the termination-of-parental rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her

child.  *Cobb v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 85, 512 S.W.3d 694.  Moreover, a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances.  *Id.*  Finally, a parent's past behavior is often a good indicator of future behavior.  *Id.*

### III.  *Statutory Grounds*

The circuit court granted the termination petition on the basis of the following statutory grounds under Arkansas Code Annotated section 9-27-341(b)(3)(B)(vi)*(a)*, (vii)*(a)*, and (ix)*(a)(2)–(3)*: a finding by the court that the juvenile or a sibling was dependent-neglected due to abuse that could endanger the life of the child and was perpetrated by the juvenile's parent, parents, or step-parent; subsequent factors; that the parent had committed or aided in a felony battery that resulted in serious bodily injury to any juvenile; and aggravated circumstances, specifically that there is little likelihood that services to the family would result in successful reunification and that a child or sibling has been neglected or abused to the extent that the abuse could endanger the life of the child.  Although the circuit court found multiple statutory grounds for termination, only one ground is necessary to support the termination.  *See Reid*, *supra*.  Appellant argues that the circuit court erred in terminating her parental rights because there was insufficient evidence to support any of the grounds alleged in the petition to terminate parental rights.  We cannot agree and hold that there was sufficient evidence to support, at a minimum, the aggravated-circumstances ground.

Arkansas Code Annotated section 9-27-341(b)(3)(B) defines the aggravated-circumstances ground as follows:

(ix)*(a)* The parent is found by a court of competent jurisdiction, including the circuit court juvenile division, to:

. . . .

*(3)(A)* Have subjected any juvenile to aggravated circumstances.

*(B)* "Aggravated circumstances" means:

*(i)* A juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification;

. . . .

*(iii)* A child or a sibling has been neglected or abused to the extent that the abuse or neglect could endanger the life of the child[.]

Regarding the aggravated-circumstances ground, appellant does not contest that TP was injured. Instead, she argues that there was not clear and convincing evidence offered that she perpetrated the abuse or that she was the one who abused TP to the extent that it endangered TP's life. She further argues that there was no evidence that she aided, abetted, or conspired with Mr. Gibby to commit such an act, and despite Mr. Gibby's testimony at the termination hearing to the contrary, she points to Mr. Gibby's previous confession that he perpetrated the abuse. She is critical of Mr. Gibby's testimony and the testimony of Mr. Gibby's family members and asks us to credit her testimony instead. Although appellant acknowledged that she had cursed during her testimony at the termination hearing, she explained that her conduct was excusable because "her soon to be ex-husband and his family accuse[d] her of harming her daughter." Finally, she argues that further services could have

21

resulted in successful reunification with her children. Citing *Young v. Arkansas Department of Human Services*, 2018 Ark. App. 270, 549 S.W.3d 383, she more specifically argues that her lack of ability to provide a reasonable, rational explanation of what happened to TP should not prevent reunification when she was otherwise in compliance with the case plan.

Appellant's reliance on *Young* is misplaced because the facts in *Young* are distinguishable from the facts of this case. First, *Young* involved an appeal from an adjudication order of dependency-neglect—not a termination order. *Id.* More importantly, it was evident that Young could not be expected to offer an explanation for her child's death when it was undisputed that she was not home when the alleged injury occurred. *Id.* That is simply not the case here.

Rather, we find the facts of this case more comparable to those in *Bentley v. Arkansas Department of Human Services*, 2018 Ark. App. 374, 554 S.W.3d 285. In *Bentley*, CJ was taken to the emergency room where it was discovered that she had injuries consistent with shaken-baby syndrome along with a healing clavicle fracture. CJ had been in the care of Bentley and her live-in boyfriend, Jeffrey. Therefore, in light of those facts, Bentley was either a perpetrator of the physical abuse of CJ, or at a minimum, Jeffrey was the offender, and Bentley failed to protect CJ. We thus noted in our opinion that "it was extremely important that Bentley demonstrate to the circuit court that C.J. would be safe if returned to Bentley's custody." *Bentley*, 2018 Ark. App. 374, at 7, 554 S.W.3d at 290. Instead, Bentley had changed her explanation for CJ's injuries multiple times, and despite services, she "did not identify any deficits of her own, showed no awareness of her involvement in the case, and

exhibited credibility issues[.]" *Id.* at 8, 554 S.W.3d at 291. The circuit court terminated Bentley's parental rights, finding that Bentley had subjected CJ to aggravated circumstances—specifically, that there was little likelihood that services would result in successful reunification—and that termination was in CJ's best interest. *Bentley*, *supra*.

On appeal, Bentley argued that there was insufficient evidence to support the circuit court's aggravated-circumstances finding because she had complied with the case plan and court orders. *Id.* We disagreed and held that compliance with a case plan does not justify reversing a termination case if the appellant continued to make decisions adverse to the child. *Id.* Instead, what mattered was whether Bentley's completion of the case plan achieved the intended result of making her capable of caring for CJ. *Id.* However, the circuit court did not find Bentley credible, and we affirmed the circuit court's finding that there was little likelihood that further services would result in Bentley's successfully reunifying with CJ. *Id.*

Here, TP was clearly subjected to physical abuse that endangered her life. According to the adjudication order from which appellant did not appeal, Dr. Clingenpeel opined that the history given by appellant "is at variance with the injuries presented." It is undisputed that appellant was home when she and Mr. Gibby called 911 after TP had stopped breathing. Therefore, just as in *Bentley*, appellant was either a perpetrator of the physical abuse of TP, or at a minimum, Mr. Gibby was the offender, and appellant failed to protect TP. Mr. Gibby and other family witnesses testified that it was appellant who had taken TP into the bathroom alone at Ms. Coffman's house shortly before the family returned home and TP stopped breathing. Although Mr. Gibby admitted that he had previously confessed to

23

perpetrating the abuse, he denied that he abused TP and explained that he had lied because he had been threatened by appellant and her family. Further, there was testimony that supported the circuit court's finding that appellant has anger issues and had exhibited violence in the past. Appellant's testimony and statements given throughout the pendency of the case had been inconsistent, and the circuit court specifically found that "due to the serious nature of the injuries, and the mother's continued refusal to account for them, there will be little likelihood that any further services could successfully reunify this family." The court's finding is further supported by Ms. Cochran's testimony that because appellant refused to provide a reasonable explanation for TP's injuries, there were not any services that could be offered to increase the likelihood of reunifying the family.

Appellant is essentially asking this court to reweigh the evidence in her favor and to reach a result contrary to that of the circuit court. However, it is not reversible error for the circuit court to weigh the evidence differently than how appellant asks the evidence to be weighed. *Bentley, supra; see also Reyes-Ramos v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 46, 571 S.W.3d 32. The credibility of any witness's testimony is to be assessed by the trier of fact—and the trier of fact may believe all, part, or none of it. *Bentley, supra.* Here, the circuit court credited other witnesses' testimony over that of appellant's. In light of these facts, we cannot hold that the circuit court clearly erred in its findings, and we affirm the circuit court's aggravated-circumstances finding. Because we conclude that DHS adequately proved the aggravated-circumstances ground, we need not discuss the remaining grounds found by

the circuit court.  *See Kohlman v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 164, 544 S.W.3d 595.

## IV.  *Best Interest*

Appellant does not challenge the circuit court's findings regarding adoptability. Thus, we need not consider that issue.  *Yarbrough v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 429, 501 S.W.3d 839.  Instead, she alleges that the evidence failed to establish that she posed such potential harm that would warrant terminating her parental rights.  We disagree.

In this case, the circuit court had ample evidence of potential harm to support its best-interest finding.  As set forth above, this case began after it was discovered that TP was a victim of physical abuse that endangered her life.  Evidence was presented that appellant either played a role in TP's injuries or, at the very least, failed to protect TP from the abuse. However, appellant argues on appeal that the circuit court erred because she does not have anger issues, she has bonded with her children, she has complied with the case plan and court orders, and she has shown that she could provide a safe home for her children by separating herself from Mr. Gibby.  Appellant asks us to reweigh the evidence and second-guess the circuit court's credibility determinations, which we decline to do here.  *See Bentley, supra.*  We have previously held that a parent's failure to protect provides an adequate basis for finding that a child would be subject to potential harm if returned to the parent and, as such, will support a circuit court's assessment of potential harm.  *Tovias v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 337, 601 S.W.3d 161.  Moreover, Arkansas appellate courts have repeatedly held that a parent's past behavior is an indicator of likely potential harm should

the child be returned to the parent's care and custody. *Yelvington v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 337, 580 S.W.3d 874. Because we are not left with a definite and firm conviction that a mistake has been made, we hold that the circuit court did not clearly err in finding that termination was in the children's best interest. Accordingly, we affirm the order terminating appellant's parental rights.

Affirmed.

GRUBER and VAUGHT, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Casey D. Copeland*, attorney ad litem for minor children.